UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

————————————————————————————

APPALACHIAN RAILCAR SERVICES, INC.,     |     Case No. 1:05-cv-790

    Plaintiff,     |     HONORABLE PAUL MALONEY

    v.     |

BOATRIGHT ENTERPRISES, INC.,     |
an Alabama corporation, SHANE BOATRIGHT, an     |
individual, MATTHEW BEARD, an individual,     |
CRAIG ALLEN, an individual, and CONSUMERS     |
ENERGY COMPANY, a Michigan corporation,     |

    Defendants.     |

————————————————————————————

**Opinion and Order**

**Granting in Part and Denying in Part the Defendants' Motion for Summary Judgment:**

**Granting in Part and Denying in Part Summary Judgment to Beard on Counts 1 and 4**
(Breach of Fiduciary Duty and Duty of Loyalty)
(Breach of Contractual and Common-Law Duties of Confidentiality)
("Deemed" Claim under Michigan Uniform Trade Secrets Act);

**Granting Summary Judgment to Beard & Allen on Count 2**
(Intentional Misrepresentation / Fraud);

**Granting Summary Judgment to Boatright, Boatright Enterprises, & Beard on Count 3**
(Tortious Interference with Contract);

**Granting Summary Judgment to Defendant Beard on Count 5**
(Spoliation of Evidence);

**Granting Summary Judgment to Consumers Energy on Count 6**
(Breach of Contract);

**Granting in Part & Denying in Part Summary Judgment to Consumers Energy on Count 7**
(Vicarious Liability);

**Granting in Part & Denying in Part Summary Judgment to All Defendants on Count 8**
(Civil Conspiracy)

This is a diversity action arising out of a contract between plaintiff Appalachian Railcar Company ("ARS") and defendant Consumers Energy Company ("Consumers") regarding railcar-maintenance at Consumers' Campbell Electric Generating Station in West Olive, Michigan.

After about two and half years, ARS exercised its contractual right to unilaterally terminate the contract. Consumers solicited and received several bids for the work, including a bid by ARS, and it awarded the new contract to defendant Shane Boatright's company Boatright Enterprises (collectively "Boatright"), which then hired Matthew Beard, who had been managing the West Olive shop for ARS. The fifth defendant is Consumers senior engineer Craig Allen ("Allen").

ARS asserts claims against Beard for breach of contractual and common-law duties of loyalty and confidentiality and spoliation of evidence; against Beard and Allen for intentional misrepresentation; and against Beard and Boatright for tortious interference with contract. ARS seeks to hold Consumers directly liable for breach of contract, and vicariously liable for the actions of its senior engineer, Allen. Finally, ARS seeks to hold all defendants liable for civil conspiracy.

Essentially, ARS alleges that the defendants conspired to induce it to terminate the contract, partly by misleading it to believe that it would win a new contract that offered a higher labor rate. Consumers characterizes ARS's theory of the case as follows:

> Instead of accepting the consequences of its decision to terminate the Consumers contract in an unsuccessful effort to increase its profits, ARS has invented an incredible conspiracy theory to shift the blame elsewhere. Under this theory, ARS alleges that Beard, Boatright, and Allen were "good friends," and that as a result of this supposed friendship, they decided to manufacture disputes between Consumers and ARS as a pretext to trick ARS into terminating the contract. As part of this complex scheme, according to ARS, Defendants somehow rigged the rebid process for a multi-million dollar contract with a public utility to ensure that the contract would be awarded to Boatright Enterprises.

-2-

MSJ at 13.  Consumers maintains that ARS "refuses to accept responsibility for its voluntary business decision to terminate the Consumers contract," and they point to ARS President and CEO Kurt Higginbotham's alleged "admi[ssion] that ARS terminated the Consumers contract of its own volition in order to increase its profit, knowing that it very well could lose the contract through the rebidding process, which it did because of the high bid ARS presented."  MSJ at 1.  Finally, Consumers contends that even if it had engaged in such a conspiracy with the other defendants, ARS still cannot sustain any of its causes of action.  MSJ at 14.

All five defendants jointly moved for summary judgment.  The motion has been fully briefed, and this court heard oral argument on February 1, 2008.  For the reasons that follow, the court will grant in part and deny in part the defendants' motion for summary judgment.

The court will grant summary judgment to former ARS employee Matthew Beard on counts one and four to the extent that they allege breach of his common-law duty of confidentiality, to the extent that such a claim is preempted by the Michigan Uniform Trade Secrets Act ("MUTSA").  The court will deny summary judgment as to the remainder of counts one and four, which claim that Beard breached his common-law fiduciary duty, common-law duty of loyalty, and *contractual* duty of confidentiality, as such claims are not preempted by MUTSA under the circumstances.  The disposition of said counts leads the court to grant in part and deny in part summary judgment on count 8, civil conspiracy by all five defendants.

The court will grant summary judgment to all defendants on count 2 (intentional misrepresentation / fraud), count 3 (tortious interference with contract), count 5 (spoliation of evidence), count 6 (breach of contract).

Finally, the court will grant summary judgment to defendant Consumers Energy on count 7 (vicarious liability) as to any misconduct by defendants Beard, Boatright, and Boatright Enterprises.  The

court will deny summary judgment on this count, however, as to any conspiracy by its employee Craig

Allen.

## BACKGROUND

The Contract.  Consumers has a fleet of over 2,000 railcars that it leases to bring fuel to its power

plants.  It maintains a railcar repair shop in West Olive, Michigan, and hires outside contractors to provide

repair services at the shop.  Deposition of Defendant Craig Allen dated May 31, 2007 ("Allen") at 9-15.

In September 2002 it awarded a contract to ARS.  Am. Comp. ¶ 10; Allen at 17-18; Aug. 9, 2006

Deposition of Warren K. Higginbotham ("Higginbotham") at 163-65.

> The contract provided, in pertinent part, that ARS agreed to furnish all supervision,
>
> labor, equipment, services, transportation and tools, and unless otherwise specified by
> Consumers, all materials and parts, necessary to perform for Consumers inspection and/or
> maintenance and/or repair of railroad cars . . . which are owned by or leased to Consumers,
> as may be requested by Consumers from time to time during the term of this Contract, at
> various locations to be specified by Consumers.

Contract § 1(a).[1]  In return, Consumers agreed to pay ARS $31.20 per worker-hour (with annual increases)

and the actual price of ARS-supplied parts plus a 15% mark-up.  Contract § 3.  Consumers characterizes

the contract as a "requirements" contract and notes that it does not mention additional compensation for

overtime ("OT") work done by ARS to complete the work required.  MSJ at 3.

The contract provided that it "may be terminated by either party at any time during its initial term

or any time during any renewal term thereafter upon forty-five (45) days' prior written notice to the other

party," *see* Contract § 2(b), and ARS's CEO testified that he knew that either party could terminate the

contract at any time without giving any reason for doing so, *see* Higginbotham at 186.

_____

[1]A transcript of Allen's deposition is found at MSJ Ex. A and ARS Opp'n Ex. 4.
A transcript of Higginbotham's deposition is found at MSJ Ex. B and ARS Opp'n Ex. 1.
The ARS-Consumers contract is reproduced in full at MSJ Ex. C and ARS Opp'n Ex 15.

The Roles of ARS Site Manager Beard and Consumers Senior Engineer Allen. The contract was administered on behalf of Consumers by its senior engineer, defendant Craig Allen ("Allen"), Am. Comp. ¶ 12 and Ans. ¶ 12, who conducted monthly audits of ARS's bills during the first two years of the contract and made annual visits to ARS's facilities for more in-depth audits, Am. Comp. ¶ 15. ARS alleges that when ARS sent its first bill to Consumers, Allen questioned the bill and asked ARS to use an alternative means of calculating the price to be charged for a type of work known as wheel-set repair, and that ARS agreed. Am. Comp. ¶¶ 13-14.

Sometime in 2001, before the contract started, ARS hired defendant Matthew Beard, who signed a confidentiality agreement stating that "information about [ARS]'s business, its employees or its clients will only be released to people or agencies outside the company with [ARS's] written consent." Am. Comp. ¶¶ 17-18 and Ans. ¶ 17. Beard's duties included management of a facility that ARS established at the Consumers plant in West Olive. Am. Comp. ¶ 19 and Ans. ¶ 19.

At some point during the contract period, Beard became friendly with Allen and Boatright. *See* Am. Comp. ¶¶ 20-21; Ans. ¶ 20 ("Defendants admit that Mr. Beard and Mr. Allen have attended NASCAR races and the Indianapolis 500 together."); ARS Opp'n Ex 20 (on May 2005 application for job with Boatright's company, Beard listed his relationship to Boatright as "friend").

The Building Addition. About two years into the contract, in September 2004, ARS personnel and Consumers employee Allen attended a Railroad Safety Institute ("RSI") convention in Chicago. Am. Comp. ¶¶ 23-24; Ans. ¶ 24. During the convention, Allen met with ARS management and proposed that ARS, at its own expense, build an addition to the West Olive railcar repair ("the Building Addition"), and that ARS rejected the proposal as financially infeasible, eliciting a negative reaction from Allen, who continued to press the proposal. Am. Comp. ¶¶ 25-28. Consumers explains that the facility improvements

urged by Allen were intended to enhance working conditions by keeping snow out of the shop, thereby increasing worker productivity. Such increased productivity, Consumers claims, would have benefitted both Consumers (by increasing the number of railcars repaired) and ARS (by increasing its profit). MSJ at 5 (citing Allen at 55 and 72).

ARS contends that the contract "did not require or contemplate" that ARS would be required to construct such an addition, and, more generally, that the contract recognized ARS's status as an independent contractor with the right to choose its own means of achieving the results required by the contract. Am. Comp. ¶ 32. ARS did not believe that it could turn a profit on the contract if it built the addition without compensation, and Consumers typically did not offer compensation when the topic arose. *See* ARS Feb. 8, 2008 Filing, Ex J (undated notes that ARS claims is an outline prepared by Higginbotham and Zoller in preparation for a discussion about modifying the contract to enable ARS to afford the building addition; "Construct and pay for a new building with no guarantees of increased business to generate revenues to cover the cost of the building.").

Allen initially included this Building Addition as part of Consumers' RFP. *See* Allen at 53. That earlier version of the RFP would have asked bidders to offer two labor rates: a "straight" labor rate that did not contemplate improvements to the West Olive facility, and an "inflated" labor rate that would apply if the bidder chose to incur the expense of building the desired improvements. *See* MSJ, Ex. E (ARS Bid Package) at 53-55. Consumers dropped the building-addition request, and the corresponding inflated labor rate option, from the draft RFP before its issue. In other words, the RFP to which ARS responded in 2002 did not offer the winning bidder the option of a higher hourly labor rate as compensation if it elected to construct an Addition.

The parties agree that at the same September 2004 trade show, ARS and Allen discussed a

proposal, *see* MSJ Ex. F (Proposal dated Jan. 11, 2005), whereby ARS would finance and construct the Addition in exchange for an extension of the existing contract.  *See* Allen at 52; Higginbotham at 204-05; Deposition of ARS Vice-President of Sales and Marketing John Zoller dated August 10, 2006 ("Zoller") at 93.[2]  ARS told Allen that it would not finance the Addition unless Consumers offered a higher hourly rate rather than merely an extension of the existing contract, and Consumers refused.  *See* Allen at 58-60 and Higginbotham at 206.  The parties were never able to reach an agreement regarding the Addition.  *See* Higginbotham at 210.

ARS believes that Consumers used the Addition as a pretext to induce ARS to terminate the contract.  Consumers responds by pointing to ARS VP Zoller's testimony that he believed Allen honestly thought ARS would earn more profit if it financed the Addition.  *See* MSJ at 6, quoting Zoller at 94 (stating that Zoller had "no doubt" in his mind that "[Allen] thought ARS would make more money if [ARS] built this new building").

<u>ARS Receives Excellent Performance Review for 2004.</u>  Consumers' Fuels Transportation and Planning Director Brian Galloway, who was senior engineer Allen's supervisor, testified that ARS achieved 98.87% railcar availability for 2004, which represented superior performance:

> Q.   Okay.  Under the first category of "Railcar Availability," the level of achievement is "Exceptional":  "Year end availability of 98.87 percent was above the stretch goal of 98.33 percent."  Am I correct that stretch goal means that you set a high goal in the first place and exceeded that goal?
>
> A.   The stretch goal is a higher level than the – what would considered a fully effective target.  Yes.
>
> Q.   Okay.  And that goal was exceeded for railcar availability in 2004?
> A.   The measure of that, yes.
>
> * * *
>
> Q.   * * *  [U]nder Number 5, "Railroad to Repair Facility Maintenance Ratio," it has

---

[2]A partial transcript of Zoller's deposition is found at MSJ Exhibit D.

a level of achievement below ["]target["]: "There was an improvement in the aggressive goal of 17.5 percent from 2003 performance. 2003 was 33.2 and 2004 was 28.8." Can you explain to me one more time what it is you're trying to achieve here with that goal? Because you're shooting for a lower number each time, right?

A.    Yes, we're trying to get the – as much maintenance as possible performed at the rail repair facility.

ARS Feb. 8, 2008 Supp. Filing, Ex H.1 (Oct. 24, 2007 Galloway Dep) at 17:12 to 19:10.

<u>Late 2004 to Early 2005:  Disagreement over Alleged Railcar Repair Backlog and OT</u>

Consumers states that in late 2004 and early 2005, several issues came to a head.

Most importantly, Allen told ARS that it needed to increase its output to get rid of a growing backlog of cars to be repaired by either having its employees work overtime or by hiring more employees, but ARS resisted because it believed that would cut too deeply into its profit margin.

ARS alleges that Craig Allen manufactured these issues as a pretext to induce ARS to terminate the contract.  The undisputed evidence does not support this assertion.  Instead, it shows that Allen made every effort to work with ARS (specifically with Higginbotham, Vice President of Sales and Marketing John Zoller, and COO Jay Phillips) to resolve these issues in a mutually beneficial manner and that ARS ultimately felt that it was in its best interest to terminate the contract.

MSJ at 4; *see also* Am. Comp. ¶ 31 (in early 2005, Allen asked ARS to perform OT work that ARS considered excessive).  Consumers alleges that at one point in late 2004, the backlog of railcars needing repair at West Olive reached 106 cars.  MSJ at 8, citing Allen 86 and 129.  Galloway had made it clear that if ARS did not reduce the backlog, Consumers would send railcars to another repair facility.  MSJ at 8-9, citing Allen 130-31 and Ex. K (Allen's March 14, 2005 Notes) ¶ 8.

Sometime in the fall 2004, ARS sent some cars from West Olive to be repaired at another ARS facility.  Consumers, however, told ARS that the quality and timeliness of the repairs done at the other plant were unacceptable.  MSJ at 9, citing Ex L.

In early 2005, Allen told ARS that it needed to increase its productivity to remedy the backlog of

railcars in need of repair.  MSJ at 9, citing Allen 85-86, Higginbotham 210-11, and Zoller 105-06.  In a

February 2005 meeting, Allen suggested to ARS's Jay Phillips that ARS should catch up on the backlog

by having its existing employees work OT or by hiring additional workers; he followed up with a March

3 e-mail and spreadsheet trying to convince ARS that it would profit by working the OT.  MSJ at 9 (citing

Ex. M at item no. 3 and Ex. N[3]).  ARS responded that it would not work OT unless Consumers paid extra

for it, Ex. B at 211.  Consumers complains, "ARS has admitted that the contract required ARS to do all

the work that Consumers needed at the specified labor rate," MSJ at 9 (citing Ex. D at 105-06).

Consumers admits that Allen mentioned the possibility of ARS cancelling the contract and

proposing a new contract that would compensate the contractor for OT.  MSJ at 9 (citing Ex. A at 127-28).

Consumers rejects any suggestion, however, that asking ARS to work OT was a pretext to induce ARS

to terminate the contract.  Consumers argues,

> Only after ARS demanded additional compensation not available under the current contract
> did Allen explain that such compensation was not available under the current contract, and
> that the only way ARS could get paid for working overtime was to terminate the existing
> contract and win the rebid under those terms.

MSJ at 10.  In that vein, Consumers points to Higginbotham's testimony that (1) he was not under duress

when he decided to terminate the contract, (2) ARS bid for a new contract because it wanted a higher labor

rate, (3) he knew that ARS could lose the re-bid and was "comfortable" with that possibility, and (4) he

---

[3]

Allen's March 3, 2005 e-mail to ARS-COO Jay Phillips read,

> Please look at the attached spreadsheet to see how it is more beneficial for ARS to
> work [OT] compared to straight time.  The fixed costs for 40 hours are only
> estimates.  You will need to increase or decrease the costs to the most realistic
> number to see how [OT] is of a benefit to ARS as long as productivity is maintained.

MSJ Ex N at 1.  The spreadsheet attached by Allen estimated that ARS would earn a profit of $13.72
per man-hour of straight time, increasing to a profit of $19.38 per man-hour of OT.  *Id.* at 2-3.

had received "no guarantee" from Consumers that ARS would win the re-bid.  MSJ at 10-11 (quoting Ex.

B at 242-44, 218, 246-47).  Consumers also points to  Zoller's testimony that there was no guarantee that

ARS would win the re-bid.  MSJ at 11 (citing Zoller at 210).

Late 2004 to Early 2005:  Disagreement over Wheel-Set Charges.  In early 2005, Allen orally told

ARS that it had overcharged Consumers for wheel-set repairs; he repeated this statement in a letter dated

March 1, 2005.  *See* Am. Comp. ¶ 29; Ans. ¶ 29; MSJ Ex. G (Allen letter).  ARS maintained then, and

now, that it had used the billing formula required by Allen to determine the price for wheel-set repairs, and

therefore it had not overcharged.  *See* Am. Comp. ¶ 30.

Consumers addresses the wheel-set issue by going back to pre-contract negotiations in September

2002.  Consumers notes that the contract entitled ARS to cost-plus-15% for all parts, and that cost-plus-

15% for a wheel set at that time amounted to only $684.25.  *See* MSJ at 7 (citing Ex. G).  In September

2002, ARS and Consumers agreed to pay ARS $800 for each wheel set; that covered the cost-plus-15%

($684.25) and an additional $115.75 to reimburse ARS for a surcharge it would have to pay the wheel-set

supplier.  *Id*.  According to Consumers, in January 2003

> Allen, having forgotten that he had already built in the surcharge to the base price of the
> wheel sets several months earlier, agreed to place an additional $200 premium on the scrap
> wheel price. [citing Allen 93 and Ex G (Allen March 1, 2005 letter)] Thus, while ARS was
> only being charged a single $200 scrap surcharge by [wheel set supplier], Consumers was
> paying $315.75 to compensate ARS for that surcharge, thereby giving ARS a windfall to
> which it was not entitled under the contract.

> In December 2004, Allen first discovered that Consumers had inadvertently left in the
> $115.75 premium on the price of the wheels, while also reimbursing ARS for the $200
> [scrap metal] surcharge. [citing Allen 90-91] In January 2005, Allen wrote to ARS's
> accountant, and informed ARS that the wheels from that point forward were to be invoiced
> at the cost plus 15% rate, and should not include the additional $115.75 per wheel set.
> [citing MSJ Ex. H (Allen Jan. 25, 2005 e-mail to ARS)] After investigating what happened,
> Allen brought this issue to the attention of ARS management and requested a refund of the
> extra $115.75 per wheel set it had been paying since 2003, which totaled approximately
> $200,000.  [citing MSJ Ex. G (Allen March 1, 2005 letter) and Zoller 135]  ARS denied

that it owed Consumers any refund for the wheel sets, although it did not provide Allen with any basis for its denial.  Indeed, after Allen made ARS aware of the issue, ARS stopped double-charging Consumers for wheel sets. [citing Allen 97]

MSJ at 7-8.

ARS alleges that during the discussions about the alleged overcharges in February and March 2005, both Consumers employee Allen and ARS employee Beard suggested to ARS's senior management that ARS exercise its right to terminate and re-bid for the work at a different rate.  The defendants deny this.  *Contrast* Am. Comp. ¶¶ 33-35 *with* Ans. ¶¶ 34-36.

March-April 2005:  ARS Terminates the Contract and Loses the Re-Bid to Boatright

On March 25, 2005, ARS e-mailed Consumers a notice that it was terminating the contract, Am. Comp. ¶ 37 and Ans. ¶ 37, effective in forty-five days.  ARS's termination letter asked Consumers to consider it for "any new RFPs and/or bids for railcar maintenance . . . ."  MSJ Ex. O.

That same day, Allen sent an RFP to ARS, Boatright, and several other companies, stating that bids for a five-year contract were due on April 15 and Consumers would select a winner by April 22.  Am. Comp. ¶ 38; Ans. ¶ 38; Allen 159-61; and MSJ, Ex. P (copies of letters requesting RFPs).[4]

Also that same day, Boatright Enterprises (an Alabama corporation) applied for a certificate of authority to conduct affairs in Michigan.  *See* Am. Comp. ¶ 39; Ans. ¶ 39.  In April 2005, Higginbotham flew to Michigan to meet with Allen, who asked him to sign a printed version of the ARS termination letter; Higginbotham did so.  Am. Comp. ¶¶ 42-43.  Allen then suggested negotiating the alleged overcharge from $200,000 down to $25,000.  Am. Comp. ¶¶ 43-44.

---

[4]

Each of Allen's letters to the prospective bidders states, "The suggested contract term of five (5) years is to run from May 10, 2005 through May 9, 2009."  MSJ, Ex. P.  That comprises a period of four years, not five.  The court surmises that Allen intended to state the contract's end date as May 9, *2010*.  In any event, this discrepancy is not material to the issues raised on summary judgment.

-11-

ARS alleges that its employee, Beard, provided confidential and proprietary information to Boatright so that Boatright could undercut ARS's bid, Am. Comp. ¶¶ 53-55.  As proof of Beard's collaboration with Boatright, ARS alleges that while Beard was still employed by ARS, he "arranged, using Boatright Enterprises's credit, to lease a truck in his [anticipated future] role as facility manager for Boatright Enterprises."  Am. Comp. ¶ 61.

ARS also alleges that Beard installed software on ARS computers and erased certain documents and communications, such as e-mails by which Beard sent confidential and proprietary information to Boatright Enterprises.  Am. Comp. ¶¶ 67-68 (denied by Ans. ¶¶ 67-68).

Consumers awarded the new contract to Boatright's recently formed affiliate, which then hired Beard to manage West Olive.  Am. Comp. ¶¶ 56 & 62; ARS Sur-Reply, Ex B (Deposition of Matthew L. Beard dated Aug. 7, 2006 ("Beard") at 173 to 174) and Ex C (Deposition of Rush Shane Boatright dated Aug. 8, 2006 ("Boatright")) at 11.  Consumers alleges that Beard's salary stayed the same, at about $50,000 per year.  MSJ at 12, citing Ex. Q (Beard)) at 156 to 157.

Boatright submitted the lowest bid, Transco the second-lowest, and ARS the third-lowest. Consumers has provided, without contradiction from ARS, the following comparison of the bids:

**Boatright**
o    Labor Rate comparison shows that Boatright is below TRANSCO by $89,180.81 over the life of the contract, or $17,836.16 per year.  Boatright is below ARS by $205,340.81 . . . , or $41,068.16 per year.

o    High volume material . . . Boatright is below ARS by $10,146.61 over the life of the contract and below TRANSCO by $309,170.06 . . . .

o    If overtime is required, Boatright will not charge time and a half.
* * *
**Appalachian Railcar Services, Inc.**
o    ARS placed third in the bid evaluation.
o    ARS bid the highest Labor Rate.
o    ARS will charge overtime at time and one half . . . .

-12-

MSJ, Ex. S (Allen Memo to W.E. Garrity & B.D. Galloway dated Apr. 22, 2005) (boldface added).

ARS filed a complaint with Consumers, asking it to re-evaluate the re-bid and to investigate Allen's conduct in connection with the termination and re-bid.  Consumers contends that it conducted an investigation and found that Allen had done nothing improper, while ARS maintains that Consumers failed to conduct a thorough investigation.  *See* Am. Comp. ¶¶ 64-66; Ans. ¶¶ 64-66.

Finally, Consumers alleges that in early April 2005 – after ARS terminated the contract but before the new contract had been awarded – ARS and Allen agreed that ARS would repay $25,000 in installments to Consumers to resolve the dispute over wheel-set charges.  MSJ at 8, citing Allen 104-06 and Ex. I (ARS CEO Higginbotham e-mail dated April 22, 2005).  Consumers alleges that after it awarded the new contract to Boatright, ARS refused to honor the alleged compromise.  MSJ at 8.  Consumers decided not to pursue repayment of the wheel-set settlement amount from ARS.  MSJ Ex. J (Allen e-mail to Higginbotham dated July 25, 2005).

Evidence that Even *Before ARS Terminated*,
Allen, Beard, and Boatright Expected and Planned for Consumers to Hire Boatright

ARS alleges that sometime during the first two years of the ARS-Consumers contract, Beard, Allen, and Boatright began "plotting" for Boatright's company (Boatright Enterprises) to take over the contract.  *See* Am. Comp. ¶ 22.  ARS points to Allen's handwritten notes dated March 21, 2005, which was four days before ARS terminated.  Allen's note from that date reads, in its entirety:

3/21/05         *MATT*

1.    Looks like     a)     3 weeks to respond to "RFP"
                     b)     1 week to evaluate
                     c)     2 weeks to set up
           If ARS doesn't win[,] who does it go to

-13-

2.     What tools & parts would be bought from ARS?
                    ------>  Air compressor?
                    a)     Will have to have electrician unhook
                    b)     Fork truck

3.     How long will it take to start working cars?

4.     *What will the structure be (company) Boatright Ent., Inc. can sign contract.*  Then assign to another company if needed.

5.     Met Shane [Boatright] at RSI [Railroad Safety Institute] Show

ARS Opp'n, Ex 22 (emphasis added).  Allen testified that this last item was a "question" to himself as he tried to recall when he first met Boatright, and that in fact he realized that Boatright had *not* been at the RSI show in Chicago in late 2004.  *See* Consumers Supp. Filing, Ex A (Allen) at 145:1-14 and 148:3-19. A reasonable factfinder could disbelieve Allen's claim on this score, however, particularly given that Allen's note item number 5 was phrased as a declaration, not a question.

ARS points to a spreadsheet Allen prepared on March 23, 2005, two days before ARS terminated. The spreadsheet estimated how much the new contractor would have to pay for sixteen items per hour, workday, week, month, and year.  The expenses were: straight-time average [wage], FICA tax, Medicare tax, holiday pay, consumables, fork truck, backhoe, air compressor, *supervisor - Matt*, *new Ford crew cab*, secretary, *Alabama employee*, S10, welders, health and liability and other insurance, and "expense account."  ARS Opp'n Ex 23.  Allen's spreadsheet contains a note reading, "Matt: Think of every expense you can.  See if estimate is accurate.  If not, raise the estimate."  *Id.*

ARS believes that the March 23, 2005 Allen spreadsheet entry for "Supervisor-Matt" is material because it reveals Allen's plan to have Consumers award the new contract to Boatright, and his understanding that Boatright would then hire Matt Beard away from ARS to continue supervising West Olive.  Beard himself testified that he thought the Allen spreadsheet entry for "Supervisor-Matt" referred

-14-

to him.  *See* Beard 152:23 to 153:16.

Likewise, ARS believes that the spreadsheet entry for "Alabama employee" is material because it reveals Allen's plan to have Consumers award the new contract to Boatright, an Alabama corporation. *See* Beard 154:4-9 (Beard acknowledges Boatright's home office is in Alabama).  Allen testified that the Alabama company referred to was not Boatright but Progress, which was ARS's predecessor contractor at West Olive.  ARS contends that Allen's explanation is not credible because Consumers had experienced extreme management and quality problems with Progress

> which had pulled out months early in 2002, necessitating a 15-day start-up for ARS. [Ex. 4, Allen. at 208].  Mr. Allen claimed not to recall whether he ever spoke with Progress Rail about Matt becoming an employee there. [Ex. 4, Allen. at 209].  It is unlikely that he would have done so.  In 2002, Mr. Allen had told Higginbotham that he was dissatisfied with Progress for many reasons, including safety concerns; injuries; shop conditions; lack of proper tools to safely do the work; theft by Progress employees; quality of work performance; frequent firing of on-site supervisors; inadequate staffing, and failure of management to call on him or satisfactorily respond to his various concerns. [Ex. 1, Higginbotham at 156-57].

> No documents have been produced evidencing any bid by Progress Rail in 2005, and, Mr. Allen himself claims that only ARS, Boatright Enterprises and Transco Rail Services bid on the contract.  Moreover, in light of Mr. Allen's document entitled "MATT," authored two days earlier and contemplating that "Boatright Ent." could sign the contract, Mr. Allen's testimony on this point is not credible.  Similarly incredible is his testimony that the note to "Matt" on his March 23, 2005 spreadsheet was not a note to Matt Beard.

ARS Opp'n at 18-19 n.9.

ARS believes that the March 23, 2005, (two days before ARS cancelled) Allen spreadsheet entry for "new Ford crew cab" is material because it reveals Allen's intent to reward Beard with a new Ford truck once ARS was induced to terminate and was replaced with Boatright.  Beard himself testified that the "new Ford crew cab" entry "probably" referred to "the one I've got now"; he confirmed that he meant the truck leased from the Redeker Ford dealership in Grand Haven.  *See* Beard 153:20 to 154:3.  ARS introduces documents from that Ford dealership showing that Beard leased a new Ford truck *on*

*Boatright's credit* even before he resigned his employment with ARS.  *See* ARS Opp'n, Ex 30.  The lease

pertained to a "new" 2005 Ford F-250 (mileage 779) valued at over $44,000, and it required monthly

payments of $754 for three years, with the first payment due on April 28, 2005.  *Id.*  The lease stated that

the vehicle was for "personal" use, but next to Beard's signature are handwritten entries reading "Boatright

Enterprises Inc" (on the left) and "Agent" (on the right).  *Id.*  The implication is that the "Boatright

Enterprises Inc" and "Agent" entries are in Beard's handwriting, but ARS does not expressly allege that.

ARS presents a signed statement by an employee of the relevant Ford dealership, stating, that Matthew

Beard

> c[ame] into Redeker Ford in April 2005 to purchase/lease a new truck.  I recall this because
> it is not common for an individual to want to buy such an expensive truck in a single day.
> Mr. Beard did not have all the information necessary to finalize the lease that day.
> Approximately 10-14 days later, on April 27, 2005 Mr. Beard came in and finalized the
> deal and took possession of a Ford Super Duty F-250.

ARS Supp. Filing, Ex. K (Jan. 14, 2008 statement of Mike Arnold).

In addition, sometime on or shortly after April 28, 2005, an ARS employee told Higginbotham that

Beard was driving a new Ford truck.  Higginbotham 270:25 to 271:4.  The employee told Higginbotham

that Beard had said his new employer bought the truck for him several days before Consumers awarded

the new contract, even though Beard was still working for ARS at that time.  *Id.* 271:5-25.  The employee

also reported that Beard's truck bore a temporary license plate ("tag") with an expiration date of May 12,

2005.  *Id.* 271:1-4.  On the premise that Michigan typically issues such temporary tags only for a period

of thirty days, ARS implies that the temporary tag was evidence that Boatright bought the truck for Beard

on about April 12, 2005.  *Id.* 272:1-22.

As further purported evidence that Allen wanted ARS to terminate so that he could have

Consumers award the new contract to Boatright, ARS introduces a letter consistent with the notion that

-16-

Allen had been in regular communication with Boatright about the West Olive shop even before ARS terminated.  The letter was written on Boatright corporate letterhead and dated March 14, 2005 – eleven days before ARS terminated.  Boatright wrote to Allen,

> Thank you for the many courtesies extended to me on the telephone.  Please accept this letter as notification that Boatright Enterprises, Inc. will bid on your Railcar Repair Contract when the opportunity presents itself in the future.  Please advise me of any order of operations we need to follow to meet your guidelines for bidding.

> Thank you for your interest in our company and you may be assured you will be well pleased with our excellent service and quality products.

ARS Opp'n, Ex 28.

Moreover, it is undisputed that the day before ARS called Allen to terminate, Boatright obtained the documents needed to apply for a license to conduct business in Michigan.  Boatright signed his application on March 25, 2005, the very day that ARS terminated, and it was filed with the Michigan state government on March 31, 2005.  *See* ARS Opp'n, Ex 32 at 2-3.

ARS also emphasizes that Allen sent the Request for Proposal ("RFP") for the re-bid out on the same day that Higginbotham called and informed him that ARS would terminate the contract – March 25, 2005 – without even waiting for the written notice of termination that Higginbotham promised during the call.  ARS points a note handwritten by Allen on that date, which states, in its entirety, "Kurt [Higginbotham] called and said he wanted to rebid the contract.  He will send an email letter today or Monday.  He gave permission to send the RFP."  ARS Opp'n, Ex 31.

> Evidence Purporting to Show that Beard and Boatright Lied
> About the Nature and Extent of their Pre-Termination Communications

Beard testified that he never communicated with Boatright by phone or otherwise, between 1999, when he called Boatright to place an order for parts, and late January 2005, when he called Boatright to discuss Consumers' need for railroad ties.  *See* Beard 87:5 to 89:4 and 89:14 to 90:22.  Beard also testified

that from late January 2005 through March 2005, he had only "three or four" phone conversations with Boatright, and the calls concerned ARS's need for railroad ties, the possibility of ARS making more money by selling parts to "short-line" railroads. *See* Beard 90:23 to 95:4. Beard acknowledged that ARS records showed a 30-minute phone call from the West Olive shop to Birmingham, Alabama on March 9; a "very quick" call to Birmingham on March 11; and four more calls, of unspecified duration; Beard stated that the March 9 call was a conversation between him and Boatright solely about railroad ties and railcar parts, while the other five calls on March 11 and shortly thereafter were "probably" calls to Allison, Boatright's assistant, who handled railroad ties. *See* Beard 96:5 to 97:6. The foregoing calls were apparently to Boatright's office telephone. Beard also acknowledged calling Boatright's cellular telephone "a couple times" during this same period of late January to March 2005. *Id.* 100:22-24.

ARS submits phone-company records showing 61 calls between Beard's cell phone and Boatright's cell or office phones between January 27 and March 25, 2005, then 88 additional calls between those numbers from March 25 through April 28, 2005 (the period between ARS's termination and Consumers' awarding the new contract to Boatright, during which Beard was still employed by ARS). *See* ARS Opp'n Ex 34 (call log). Finally, the phone records show two calls from Boatright's cell phone to Beard's home phone from January 27 through April 28, 2005. *Id.*

ARS contends that the discrepancy between Beard and Boatright's testimony and their phone records shows that they were lying about the nature and extent of their communications in the first four months of 2005. ARS believes they lied to cover up the fact that they were conspiring to induce ARS to terminate the contract, enable Boatright to submit a bid that was sure to beat ARS's bid, and have Consumers (at Allen's recommendation) award the new contract to Boatright, whereupon Boatright would hire Beard as his West Olive manager. ARS argues that the 2005 phone evidence

-18-

alone destroys the credibility of these witnesses.  It might be possible – even for people who claim to remember each other from one routine business call five years earlier – to forget whether they spoke three times or seven times, for example.  It is *not* possible to forget placing and/or receiving *150* calls instead of only a few calls over a two-month time period.  Furthermore, it is inexcusable, and there is no plausible excuse, for Matt Beard to have been communicating with his employer's competitor at all, much less this frequently, during the time period in question.

ARS Opp'n at 21.

# PROCEDURAL HISTORY

ARS filed the original complaint in November 2005, naming Beard, Boatright, and Boatright Enterprises.  In October 2006, with leave of court, ARS filed the first amended complaint, which added two defendants, Consumers and Consumers senior engineer, and asserted eight claims under state common law.  ARS asserted three claims against its former employee Matthew Beard alone:

| Count 1 | Breach of Fiduciary Duty and the Duty of Loyalty |
| Count 4 | Breach of Contractual and Common-Law Confidentiality Obligations |
| Count 5 | Spoliation of Evidence |

ARS asserted two claims against Consumers alone:

| Count 6 | Breach of Contract |
| Count 7 | Vicarious Liability |

ARS asserted claims for intentional-misrepresentation against Beard and Allen (count 2) and tortious interference with contract (count 3) against Boatright, Boatright Enterprises, & Beard).  Finally, ARS alleged that all five defendants engaged in a civil conspiracy (count 8).  As compensation for lost profits, ARS seeks about $1.08 million for the remainder of the five-year contract and $2.55 million for the five-year renewal contract which it expected.  *See* ARS Sur-Reply, Ex G (Report of Eric A. Adamy, C.P.A., C.B.A., dated June 29, 2007).  The amended complaint does not seek damages for the re-bid contract which it did not win, nor does its expert's report calculate such damages.

All five defendants timely filed a joint answer to the first amended complaint in November 2006.

In September 2007, all five defendants jointly moved for summary judgment, and ARS timely filed its opposition brief in October 2007.  The defendants filed their reply on October 30, 2007, and ARS (with leave of court) filed a sur-reply on November 14, 2007.  The discovery deadline was December 15, 2007, and no party has sought an extension of time in which to conduct discovery.

## SUMMARY JUDGMENT

Summary judgment is proper if the "'pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.'"  *Conley v. City of Findlay*, – F. App'x –, –, 2008 WL 227331, *5 (6th Cir. Jan. 28, 2008) (quoting FED. R. CIV. P. 56(c)).  *Accord Brown v. Brown*, 739 N.W.2d 313, 316 (Mich. 2007).

The movant  has the burden of proving the absence of genuine issues of material fact and its entitlement to judgment as a matter of law.  *Conley*, 2008 WL 227331 at *3 (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)).  However, the movant "need not support its motion with affidavits or other materials 'negating' the opponent's claim"; rather, the movant's initial burden is only to "point out to the district court that there is an absence of evidence to support the nonmoving party's case . . . ."  *Wilson v. Continental Dev. Co.*, 112 F. Supp.2d 648, 654 (W.D. Mich. 1999) (Bell, J.) (citing *Moore v. Philip Morris Cos.*, 8 F.3d 335, 339 (6th Cir. 1993)), *aff'd o.b.*, 234 F.3d 1271, 2000 WL 1679477 (6th Cir. Nov. 2, 2000).

Once the movant has met its burden, the non-movant must present "significant probative evidence" to demonstrate that there is more than "some metaphysical doubt as to the material facts."  *Conley*, 2008 WL 227331 at *3 (quoting *Moore*, 8 F.3d at 339-40).  The non-movant may not rest on the mere allegations of his pleadings.  *Wilson*, 112 F. Supp.2d at 654 (citing FED. R. CIV. P. 56(e) and *Copeland v.*

*Machulis*, 57 F.3d 476, 479 (6th Cir. 1995)).[5]  Moreover, the mere existence of an alleged factual dispute

between the parties will not defeat an otherwise properly supported summary judgment motion; there must

be some genuine issue of *material* fact.  *Conley*, 2008 WL 227331 at *3 (citing *Anderson v. Liberty Lobby,*

*Inc.*, 477 U.S. 242, 247-48 (1986)).

     The court must accept the non-movant's factual allegations, *ACLU v. NSA*, 493 F.3d 644, 691 (6th

Cir. 2007) (concurrence) (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992)), *cert. denied*,

– U.S. –, 76 U.S.L.W. 3436 & 3438, 2008 WL 423556 (2008),[6] and view the evidence in the light most

favorable to the non-movant, giving it the benefit of all reasonable inferences.  *Fox v. Eagle Dist. Co., Inc.*,

510 F.3d 587, 592 (6th Cir. 2007) (Griffin, J.).  But the court considers its evidence only to the extent that

it would be admissible at trial.  *Healing Place*, 744 N.W.2d at 177 (citing MICH. CT. R. 2.116(G)(6) and

*Veenstra v. Washtenaw Country Club*, 645 N.W.2d 643, 648 (Mich. 2002)).

     Ultimately, "[e]ntry of summary judgment is appropriate 'against a party who fails to make a

showing sufficient to establish the existence of an element to that party's case, and on which that party

w[ould] bear the burden of proof at trial.'"  *Davison v. Cole Sewell Corp.*, 231 F. App'x 444, 447 (6th Cir.

2007) (quoting *Celotex*, 477 U.S. at 322).[7]  As Chief Judge Bell has characterized the post-trilogy

---

[5]

     *Accord Healing Place at No. Oakland Med. Ctr. v. Allstate Ins. Co.*, 744 N.W.2d 174, 177
(Mich. App. 2007) ("When the burden of proof at trial would rest on the nonmoving party, the
nonmovant may not rest on mere allegations or denials in the pleadings, but must, by documentary
evidence, set forth specific facts showing that there is a genuine issue for trial.") (citing *Quinto v.
Cross & Peters Co.*, 547 N.W.2d 314, 317 (Mich. 1996)).

[6]

     *Accord Fall v. Loudon*, 2008 WL 375989, *6 (Mich. App. Feb. 12, 2008) (citing *Dolan v.
Continental Airlines/Continental Express*, 563 N.W.2d 23, 26 (Mich. 1997)).

[7]

     A trilogy of 1986 Supreme Court decisions "made clear that, contrary to some prior
precedent, the use of summary judgment is not only permitted but encouraged in certain
circumstances . . . ."  *Collins v. Assoc'd Pathologists, Ltd.*, 844 F.2d 473, 475-76 (7th Cir. 1988).

-21-

summary-judgment standard, "[w]hile preserving the constitutional right of civil litigants to a trial on meritorious claims, the courts are now vigilant to weed out fanciful, malicious, and unsupported claims before trial."  *Wilson*, 112 F. Supp.2d at 654.

## A FEDERAL COURT'S APPLICATION OF STATE LAW

"In applying state law, we anticipate how the relevant state's highest court would rule in the case and are bound by controlling decisions of that court." *National Union Fire Ins. Co. of Pittsburgh v. Alticor, Inc.*, 472 F.3d 436, 438 (6th Cir. 2007) (Griffin, J.) (citation omitted).  If the state supreme court has not conclusively decided the issue, a federal court presumptively looks to the decisions of the state's appellate courts:  "In anticipating how the state supreme court would rule, 'we look to the decisions of the state's intermediate courts unless we are convinced that the state supreme court would decide the issue differently.'" *US v. Lancaster*, 501 F.3d 673, 679 n.3 (6th Cir. 2007) (Griffin, J.) (quoting *Melson v. Prime Ins. Syndicate, Inc.*, 429 F.3d 633, 636 (6th Cir. 2005)), *pet. cert. filed*, – U.S.L.W. – (U.S. Nov. 29, 2007) (No. 07-7987).  In ascertaining the State's controlling law, a federal court also "*may* give weight" to the decisions of the State's trial courts.  *Bradley v. GMC*, 512 F.2d 602, 605 (6th Cir. 1975) (citation omitted).

## PRECEDENTIAL VALUE OF MICHIGAN DECISIONS

A federal court must accord the same precedential value to a state-court decision as it would be

---

*Accord In re Fin. Federated Title & Trust, Inc.*, 347 F.3d 880 (11th Cir. 2003) (the trilogy "encourage the use of summary judgment as a means to dispose of factually unsupported claims."); *Hurst v. Union Pacific Rail Co.*, 1991 WL 329588, *1 (W.D. Okla. Feb. 6, 1991) ("This trilogy of cases establishes that factual and credibility conflicts are not necessarily enough to preclude summary judgment and encourage that a summary judgment be used to pierce the pleadings and determine if there is in actuality a genuine triable issue."), *aff'd*, 958 F.2d 1002 (10th Cir. 1992); *Bowser v. McDonald's Corp.*, 715 F. Supp. 839, 840 (S.D. Tex. 1989) (the trilogy "encouraged federal district courts to use summary judgment more frequently and economically by changing the movant's burden of production . . . and by allowing qualitative review of evidence") (citations omitted).

-22-

accorded by that state's courts.  *See Mutuelle Generale Francaise Vie v. Life Ass. Co. of Pa.*, 688 F. Supp.

386, 397 n.15 (N.D. Ill. 1988) ("[O]ne Supreme Court decision (*Fidelity Union Trust Co. v. Field*, 311

U.S. 169 . . . (1940)) . . . required a federal court to ascribe the same precedential force to a New Jersey

trial court decision that such a decision would receive in that state's court system under the peculiarities

of New Jersey law.").  If a state court would not be bound by a particular state-court decision, then neither

is this court.  *King v. Order of United Commercial Travelers of America*, 333 U.S. 153, 161 (1948) ("a

federal court adjudicating a matter of state law in a diversity suit is, in effect, only another court of the

State; it would be incongruous indeed to hold the federal court bound by a decision which would not be

binding on any state court.") (citation omitted).

Michigan Court Rule 7.215(C)(2) states that "[a] published decision of the Court of Appeals has

precedential value under the rule of stare decisis."  This subsection makes no distinction based on when

the decision was issued.

However, Michigan Court Rule 7.215(J)(1) provides that "[a] panel of the Court of Appeals must

follow the rule of law established by a prior published decision of the Court of Appeals *issued on or after*

*November 1, 1990*, that has not been reversed or modified by the Supreme Court or by a Special Panel of

the Court of Appeals as provided in this rule."  Emphasis added.

Synthesizing Michigan Court Rules 7.215(C)(2) and 7.215(J)(1), the Michigan Court of Appeals

accords precedential value to *all* of its prior published decisions, regardless of when they were issued.

When a post-November 1, 1990 published Court of Appeals decision conflicts with a *pre*-November 1,

1990 published Court of Appeals decision, however, the *post*-November 1, 1990 decision prevails.

When there is a conflict between two published decisions of the Court of Appeals that were *both*

issued *after* November 1, 1990, Michigan courts must follow the first opinion that addressed the matter

at issue. *Novak v. Nationwide Mut. Ins. Co.*, 599 N.W. 2d 546, 554 (Mich. App. 1999) (citation omitted).

By contrast, Michigan Court of Appeals panels are not bound by *un*published decisions of that same court, regardless of when they were issued. *Iqbal v. Bristol West Ins. Group*, – N.W.2d –, –, 2008 WL 398881, *__ (Mich. App. Feb. 14, 2008) (citing MICH. CT. R. 7.215(C)(1)).

Finally, a federal court's interpretation of state law is not binding. *Leavitt v. Jane L.*, 518 U.S. 137, 146 (1996) (Stevens, J., dissenting o.g., joined by Souter, Ginsburg, & Breyer, JJ.) ("[T]he decision of a federal court (even this Court) on a question of state law is not binding on state tribunals . . . ."). Accordingly, this court will seriously consider our Circuit's interpretation of state law but is not bound by it.

## ARS DOES NOT SEEK RELIEF IN CONNECTION WITH ITS LOSS OF THE RE-BID

ARS often alleges conduct by the defendants that occurred after ARS terminated the contract. That is not inappropriate. The court has considered evidence of the defendants' post-termination conduct to the extent that it could lead a reasonable factfinder to conclude that ARS carried its burden on an element of a claim. It is important, however, to specify the scope of those claims with precision. ARS cannot obtain relief in connection with its failure to win the re-bid, because the amended complaint simply does not seek such relief. ARS's prayer for relief reads, in its entirety:

> WHEREFORE, Plaintiff demands a judgment for economic damages sustained *as a result of the lost contract* with Consumers Energy, annoyance, inconvenience, pre-judgment interest, post-judgment interest, attorneys' fees, plus its costs of this action. In addition, Plaintiff is entitled to and demands exemplary damages.

Am. Comp. at 23, text following ¶ 121 (emphasis added).

The amended complaint seeks recovery of damages for "*the* lost contract", i.e., only *one* contract. Given the allegations of the amended complaint that precede the prayer for relief, "*the* lost contract" is the contract that ARS terminated. Thus, ARS's prayer for relief seeks damages only for conduct and

statements that allegedly led ARS to terminate the contract.  It does not seek damages for Consumers'

decision not to award the new contract to ARS, nor for any actions or statements by other defendants that

allegedly led Consumers not to award the new contract to ARS.

It is the complaint that defines the scope of the action, and it is the prayer for relief which limits

the grounds on which relief may be obtained.  *See Swinney v. GMC*, 46 F.3d 512, 517 (6[th] Cir. 1995) ("The

plaintiffs contend that GM's representations about the VTEP caused them to forego participating in the

laid-off workers' plan, and *in their prayer for relief*, the plaintiffs ask for these benefits, not for additional

VTEP benefits.  The issue this court addressed in *Sherrod* was whether the VTEP was an ERISA plan; it

did not deal with the laid-off workers' plans. *Sherrod* is therefore not controlling . . . .").  Moreover, ARS's

CEO testified – consistent with the prayer for relief – that ARS is not seeking damages in connection with

the re-bid:

> Q.    I want to make sure I understood something.  Are you claiming damages in this
>        case under the 2002 contract or [sic] that you did have, or under the 2005 contract
>        that you never got but you bid on?
> A.    2002.
>
> Q.    Okay.  So you don't believe that you are entitled to any damages under the 2005
>        bid or any prospective contract, correct?
> A.    Correct.

Higginbotham 305:12-20.

Disposition of this case will be limited to the relief requested in the prayer for relief, as confirmed

by the testimony of plaintiff's CEO.  *See Dykstra v. Wayland Ford, Inc.*, 240 F. App'x 14, 16 (6th Cir. June

20, 2007) ("[P]laintiffs are presented with a more difficult hurdle to overcome, as they now seek damages

that were clearly never part of their original prayer for relief."); *Wigfall v. Holinka*, 2007 WL 4191967,

*3 (W.D. Mich. Nov. 21, 2007) (Maloney, J.) ("[T]his court need not resolve the claim as it relates to

plaintiff's allegations regarding the Indiana warrant as that claim is unrelated to plaintiff's prayer for

relief."); *In re Heflin*, 145 B.R. 560, 563 (Bankr. S.D. Ohio 1992) ("[D]isposition of the case may be made on the basis of the specific relief requested. The debtors have only requested that the order *fixing* support be declared void. The complaint does not refer to the subsequent wage deductions nor request them to be declared void. * * * As a result, this court has not been requested to set aside the wage deductions and will not do so.").[8] [9]

      Accordingly, any alleged misconduct occurring after ARS terminated the contract cannot <u>itself</u> be

---

[8]

      *Cf. Gongolewski v. Lexington-Fayette Urban Cty. Gov't*, 920 F.2d 932, 1990 WL 200378, *2 (6[th] Cir. Dec. 12, 1990) ("*[T]he individual defendants are not singled out in plaintiff's prayer for relief,* but are grouped with the County and referred to collectively as 'Defendants.' Plaintiff's complaint raises no individual capacity claims and therefore fails to put defendants on notice that this type of claim would be asserted at trial. Plaintiff was not entitled to have individual capacity liability submitted to the jury. ") (emphasis added); *Melville v. Cuyahoga Cty. Bd. of Elections*, 462 F.3d 486 (6[th] Cir. 1972) ("The prayer for relief of the complaint did not request a declaratory judgment . . . but requested an injunction . . . . On these facts and because of the limited nature of the prayer for relief in the complaint, this Court concludes that the issues . . . are moot.").

[9]

      *Cf. Eberly v. Optimum Nutrition, Inc.*, 2007 WL 2034279 (N.D. Ohio July 10, 2007):

      The language of the amended complaint limits this Court's inquiry into the breach of good faith claim against Optimum and ABBP. Every paragraph of count 3, from 66-72, makes explicit reference to the "contract" or "distribution agreement." At no point does plaintiff distinguish his claim in count 3 from his claim for breach of contract, as against Optimum and ABPP. While Florida law requires the presence of a breach of contract to support a claim for breach of good faith and fair dealing, it also appears to require allegations that go beyond the allegations that give rise to the breach of contract claim. Applying Florida law, count 3 is redundant and superfluous, and as such it must be dismissed.

*Id.* at *3. *Cf. also Jonaitis v. Morrison*, 2008 WL 151252, *2 (W.D. Mich. Jan. 14, 2008) (Maloney, J.) ("The prayer for relief in Jonaitis's complaint seeks not prospective injunctive relief but 'the Maximum Compensatory and Punitive Damages as allowed by law' and a 'Court order correcting all mistakes.' Consequently, this court holds that the State of Michigan's Eleventh Amendment and common-law sovereign immunity bar this court from entertaining Jonaitis's claims against both defendants in their official capacities.").

actionable with regard to ARS's decision to terminate. This includes, for example, Beard's alleged

assurance about a safe labor rate to win the re-bid; Allen's alleged statement to Higginbotham that he

would "hope and like" ARS to win the new contract, Higginbotham 247-51; and Beard's allegedly giving

Boatright confidential bid and pricing information in order to ensure that Boatright would prevail over

ARS for the re-bid contract. However, these assertions are relevant to the extent they cast light on actions

or statements before ARS terminated the contract.

## THE STATE OF THE RECORD

ARS's main opposition brief contends, "Every premise that defendants rely upon is undermined

by the (still incomplete) evidentiary record." *Id.* at 1. ARS then complains

> It is not surprising that the evidentiary record is incomplete; defendants filed their motion
> six weeks prior to the discovery deadline in effect at the time of filing, with many fact
> witnesses and all expert witnesses yet to be deposed, and discovery responses still
> outstanding.

*Id.* at 1 n.1.

For example, ARS's post-hearing filing submits Exhibit L, a report by an electronic-evidence

consultant about its forensic search of hard drives belonging to Boatright. ARS's expert details how many

times the term "ARS" appears in the extant files on Boatright's drives and in the files that have been

deleted from those drives. ARS's counsel ends this February 8, *2008* filing by stating,

> As stated at oral argument, in light of the fact that no material recovered from Boatright's
> computer hard drives has yet been made available to ARS for review, and because such
> material may lend further support to ARS's spoliation claim, entry of judgment on this
> claim is premature.

ARS Supp. Filing at 4.

These complaints about the defendants' alleged refusal or failure to turn over all items responsive

to discovery requests utterly lack merit. ARS never indicated that it could not effectively oppose summary

judgment before the completion of the scheduled discovery period, or that it needed more time for discovery than allotted by the court's initial case management and scheduling order. If that were the case, ARS could and should have asked the court to do one or more of the following:

(1)    hold the motion in abeyance and extend the time for ARS to file an opposition brief, so that the opposition brief would not be due until some time after the discovery deadline had passed and ARS had time to assimilate the information thus acquired;

(2)    deny Consumers' summary-judgment motion without prejudice, with leave to re-file following the completion of discovery; and/or

(3)    extend the discovery period.

The vehicle for such a request was FED. R. CIV. P. 56(f), which provides,

> If a party opposing a motion shows by affidavit that, for specified reasons, it cannot present facts essential to justify its opposition, the court may (1) deny the motion; (2) order a continuance to enable affidavits to be obtained, depositions to be taken, or other discovery to be undertaken; or (3) issue any other just order.

Having failed to seek relief under Rule 56(f), ARS cannot now be heard to complain that it lacked a full record on which to show genuine issues of material fact on all its claims. *See Philips v. Anderson Cty. Bd. of Bd.*, – F. App'x –, –, 2008 WL 162941 (6th Cir. 2008):

> [P]laintiff now argues that she needed deposition testimony from school employees to establish . . . . [T]he plaintiff raised this issue in her brief in opposition to the defendant's motion for summary judgment, but she did not file a Rule 56(f) affidavit notifying the court of her need for continued discovery. As a result, the district court declined to delay its ruling on the motion for summary judgment. * * *

> * * * [W]here the complaining party does not comply with the mandates of Rule 56(f) and fails to file either an affidavit or a motion giving the district court the opportunity to assess the need for more discovery, "this court will not normally address whether there was adequate time for discovery." *Cacevic v. City of Hazel Park*, 226 F.3d 483, 488 (6th Cir. 2000) (internal citations omitted). Although the plaintiff here raised her concerns about the inadequacy of discovery prior to summary judgment, she did so improperly, as the district court correctly noted.

*Id.* at *3; *see also CGH Transport v. Quebecor World*, – F. App'x –, –, 2008 WL 116385, *3 (6th Cir.

2008) ("It also argues that World's summary judgment motion should not have been granted in part because it did not have the opportunity to conduct sufficient discovery.  These arguments, however, are not properly before us because CGH did not raise these . . . concerns in the district court by, for example, either bringing a motion to compel discovery or filing an affidavit pursuant to 56(f).").[10]

Accordingly, it is proper for this court to rule on the defendants' motion notwithstanding ARS's improper complaint about discovery and the resultant state of the record.  The court will also disregard any related complaints that ARS makes to explain why it lacks evidence to show a genuine issue as to any *particular* material fact.[11]  *See No. Michigan Title Co. of Antrim-Charlevoix v. Bartlett*, 2005 WL 599867,

---

[10]

*Cf. Davison v. Cole Sewell Corp.*, 231 F. App'x 444, 446 (6th Cir. 2007) (Griffin, J.) ("[D]efendants relied upon *Daubert* . . . in requesting that the district court . . . exclude Silverman's testimony.  In her response to defendants' motion, plaintiff did not request a *Daubert* hearing or seek a Rule 56(f) continuance for additional time to provide 'facts essential to justify her opposition.'").

[11]

*See, e.g.,* ARS's Opp'n at 19 n.10:

Boatright testified that Beard's salary was not increased from the $48,000 he made at ARS to the $75,000 contemplated by Allen's March 23[, 2005] document.  Boatright and Beard have failed to produce the pertinent income tax returns for Beard or for Boatright Enterprises, both of which would corroborate their testimony, if true.  In fact, although Boatright Enterprises documents pertaining to Matt Beard's employment have been requested, pay records have not been produced in any form.

ARS's complaint about the lack of Beard's pay records was accurate when it submitted its opposition brief, but Consumers submitted Beard's pay records as Exhibit C to its reply.

Also, in the Sur-Reply, ARS states, "Defendants claim that it does not matter

if evidence of certain communications to Boatright on Beard's ARS laptop . . . were destroyed because *Boatright* produced all of the communications . . . .  But, as Defendants are well aware, as of the date of this filing [November 9, 2007], they have not produced Boatright's hard drives for examination to allow ARS to confirm this contention, despite having first been requested to do so in April of 2006.

After initially refusing to produce the hard drives, in late September [2007], following nearly a year of negotiations, Defendants finally agreed to allow a

-29-

*6 (Mich. App. Mar. 15, 2005) ("Under 2.116(C)(10), it is no longer sufficient for plaintiffs to *promise* to offer factual support for their claims at trial . . . . [A] party faced with a motion for summary disposition . . . is, in responding to the motion, required to present evidentiary proofs creating a genuine issue of material fact for trial.  Otherwise, summary disposition is properly granted.") (quoting *Smith v. Globe Life Ins. Co.*, 597 N.W.2d 28, 33 n.2 (Mich. 1999)).

### Breach of Fiduciary Duty and Duty of Loyalty
(Count 1 - Against Matthew Beard Only)

### Breach of Contractual and Common-Law Confidentiality Obligations
(Count 4 - Against Matthew Beard Only)

In November 2001, Matthew Beard signed a confidentiality agreement that provided:

> The nature of services provided by Appalachian Railcar Services, Inc. ("ARS") to its clients requires information to be handled in a private, confidential manner.  Information about ARS's business or its employees or its clients will only be released to people of agencies outside the company with our written consent.  Following legal or regulatory guidelines provide the only exceptions to this policy.

ARS Opp'n, Ex 2.

ARS contends that by providing Boatright with ARS's confidential and proprietary information – including its internal bid and pricing information – for use in undercutting ARS in the re-bid, Beard breached his contractual and common-law duties of confidentiality and loyalty.  Am. Comp. ¶¶ 95-97. ARS points to two incidents: a series of e-mails that Beard sent to Boatright that allegedly included confidential ARS information, and Beard's allegedly sharing ARS's bid and pricing information with

---

mutually-employed third-party expert to examine them.  Defendants agreed to the protocol to be used by the expert just this week – on November 6, 2007.  ARS has gone above and beyond its obligations – even agreeing to share in the costs – to obtain this discovery, which Defendants are required to produce.  Defendants have not been forthcoming, yet continue to rely on "evidence" they have withheld.

*Id.* at 11 (citations to record and briefs omitted).

Boatright.  *See* Am. Comp. ¶¶ 72 & 97.  ARS appears to concede that some or all of the non-pricing e-mails and documents are not confidential, but contends that Beard's sharing them with Boatright is evidence that he breached his duty of loyalty and fiduciary duty by helping prepare Boatright to win and work the new West Olive Shop contract.

The defendants contend that Beard is entitled to summary judgment on these claims on two grounds.  First, the defendants contend that the Michigan Uniform Trade Secrets Act ("MUTSA") expressly precludes such common-law claims against Beard.  MSJ at 16.  Defendants rely on M.C.L. § 445.1908(1), which provides, "this act displaces conflicting tort, restitutionary, and other law of this state providing civil remedies for misappropriation of a trade secret . . . ."

Second, proceeding under MUTSA, the defendants contend that "ARS's misappropriation claims (including the contract-based claim) must be dismissed because the information allegedly misappropriated by Beard in the e-mails was not confidential."  MSJ at 16-17.  While Higginbotham testified that all the information Beard sent Boatright was confidential, *see* Ex. B at 284-86 and Ex. V, defendants contend that "ARS has never articulated what information in those documents is confidential, even though they are required to do so under Michigan law."  MSJ at 17 (citing, *inter alia*, *Utilase, Inc. v. Williamson*, 1999 WL 717969, *7 (6ᵗʰ Cir. Sept. 10, 1999)).  They argue that the information consists of (1) links to publicly available websites and (2) blank standard forms generated by the Association of American Railroads and widely used in the industry, and they rely on the proposition that "publicly available, generally known information cannot constitute trade secrets information under Michigan law."  MSJ at 17-18 (quoting M.C.L. § 445.1902(d) and citing, *inter alia*, *Hayes-Albion v. Kuberski*, 364 N.W.2d 609, 614 (Mich. 1985) (setting forth factors to determine whether information is a trade secret under RESTATEMENT 2D OF TORTS § 757)).

The court determines that there is a genuine issue as to whether Beard sent confidential internal bid and pricing information to Boatright (or told Boatright that information orally). Such information constitutes a trade secret under the circumstances, so MUTSA applies and preempts ARS's claim for breach of the common-law duty of confidentiality as to that particular disclosure. *See, e.g., Vector Enviro. Group, Inc. v. 3M Co.*, 2006 WL 3004086, *4 (E.D. Mich. Oct. 20, 2006) (in preliminary-injunction context, court held that plaintiff was not likely to avoid MUTSA preemption of claim that defendant tortiously interfered with contract by misappropriating plaintiff's trade secret and convincing a third party to replace plaintiff's product with defendant's improperly-acquired duplicate product; plaintiff failed to specifically show how the tortious-interference claim rested on something beyond the misappropriation of a trade secret).

MUTSA does not, however, preempt ARS's claim for breach of Beard's *contractual* duty of confidentiality. *See* M.C.L. § 1908(2) ("This act does not affect any of the following: (a) Contractual remedies, whether or not based upon misappropriation of a trade secret.").

MUTSA defines "trade secret" as

information, including a formula, pattern, compilation, program, device, method, technique or process that is *both* of the following:

(I)     Derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use.

(ii)     Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

M.C.L. § 445.1902(d). The first criterion for MUTSA trade-secret status would be satisfied by internal pricing information, because a competitor of ARS could "obtain economic value" from its disclosure, i.e., could use knowledge of the pricing information to craft a bid that would have a better chance of winning

-32-

the new contract.  The second criterion of MUTSA trade-secret status would be satisfied, because Consumers has not disputed that ARS uses reasonable efforts to keep its pricing information secret, i.e., out of the hands of its actual or potential competitors such as Boatright.

The question is, how has ARS shown a genuine issue as to whether Beard actually provided internal bid / pricing information to Boatright?  On one hand, ARS fails to present direct evidence that Beard provided confidential pricing information to Boatright; ARS's briefs, and its supplemental post-hearing filing, fail to identify specifically which portions of which documents contain such information. The court reviewed every page of the Beard-Boatright e-mails, and their attachments, which ARS attached as Exhibit I to its post-hearing filing, and none appears to contain confidential pricing information.  "A district court is not required to search the entire record to establish that it is bereft of a genuine issue of material fact." *Chicago Title Ins. Corp. v. Magnuson*, 487 F.3d 985, 995 (6th Cir. 2007) (citation and quote marks omitted)), *cert. denied*, – U.S. –, 128 S.Ct. 1125 (2008).

But ARS *has* presented circumstantial evidence suggesting that Beard conveyed ARS's confidential pricing information to Boatright before the re-bid (perhaps orally or via an e-mail that is not in the record).[12]  Boatright's bid offered a labor rate that was, for much of the new contract period, just *one cent* different from ARS's proposed labor rate. The court cannot foreclose a reasonable jury from finding

---

12

*See, e.g., Adams v. Lockheed Martin Energy Sys.*, 199 F. App'x 405, 409 (6th Cir. 2006) ("[P]laintiffs suffer from a paucity of supporting evidence, neglecting to target any specific facts demonstrating such harm.  Instead they offer general allegations and cite to entire depositions rather than specific supporting testimony . . . .  Summary judgment practice requires more.") (citing, *inter alia*, *Wardle v. Lexington Fayette Urban Cty. Gov't*, 45 F. App'x 505, 509 (6th Cir. 2002) ("[A] district court is not required to search the record to determine whether genuine issues of material fact exist when the non-moving party has failed to point them out.")); *W.H. Porter, Inc. v. Kline Multiproducts*, 2001 WL 35729576, *3 (W.D. Mich. Dec. 12, 2001) ("[T]his court 'is not required to speculate on which portion of the record the nonmoving party relies, nor is it obligated to wade through and search the entire record for some specific facts that might support the nonmoving party's claim' . . .. ") (quoting *Interroyal Corp. v. Sponseller*, 889 F.2d 108, 111 (6th Cir. 1989)).

that Boatright's bid was "just right" because Beard told him what ARS was going to bid – at least with

regard to the labor rate.[13]  Because such information is a trade secret under the circumstances, MUTSA

thus preempts the common-law claim for breach of the duty of confidentiality.  Although it presents a

close question, the court holds that ARS has a viable claim against Beard for breach of MUTSA which

survives summary judgment.

MUTSA would <u>not</u> preempt claims against Beard for wrongful conduct that is conceptually

independent of his giving trade-secret bid/price information to Boatright – namely, the claims that Beard

breached his fiduciary duty and duty of loyalty by helping Boatright prepare to work the West Olive shop

if ARS terminated the contract and Boatright won the re-bid.  *See McKesson Med.-Surgical, Inc. v. Micro*

*Bio-Medics, Inc.*, 266 F. Supp.2d 590, 600 (E.D. Mich. 2003) (MUTSA did not preempt claim for breach

---

[13]

As ARS correctly notes, *see* Sur-Reply at 11, the apparent deletion or corruption of e-mails and documents on a laptop that was used by Beard makes it impossible to know whether Beard communicated such information (or other trade-secret or confidential information) to Boatright. *See* ARS Opp'n, Ex 41 and Sur-Reply, Ex E (expert's verified statement that two minutes after midnight on March 16, 2003, "Spybot - Search and Destroy" software was installed on laptop used by Beard).

Computer expert Morgan testified that while SpyBot's "general intended purpose is not shredding", it "contains shredding as a feature." *See* Consumers Supp. Filing, Ex B 26:21 to 27:1. Consumers calls attention to Morgan's admission that he was not "intimately familiar" with SpyBot's shredding feature, and he called the pattern of corrupted files on Beard's laptop "inexplicable" rather than stating that SpyBot was used to delete or corrupt those files. *Id.* 35:21 to 36:19 and 47:2-15.  The fact remains, however, that Consumers has not challenged Morgan's qualification as an expert, and Morgan testified that someone installed SpyBot at an unusual and arguably suspicious time (12:02 a.m.), and that SpyBot could have been used to delete or corrupt files on the laptop that was used by Beard and his secretaries.

Accordingly, if the surviving claims go to trial, ARS may be entitled to an instruction advising the jury that if they find that Beard intentionally destroyed evidence of his communications with Boatright (with SpyBot or otherwise), they may infer that he did so in order to destroy evidence that those communications included trade-secret information (in violation of MUTSA), confidential information, or simply information that showed he was working to advance Boatright's interests at the expense of ARS (in violation of his fiduciary duty and his duty of loyalty).

of duty of loyalty; "McKesson's claim . . .both according to its Complaint and its Response to Defendants' Motion, [is] based not only on McKesson's trade secrets, but also other confidential information."); *cf. Polar Molecular Corp. v. Amway Corp.*, 2007 WL 3473112, *6 (W.D. Mich. Nov. 14, 2007) (Bell, C.J.) (MUTSA preempted common-law trade-secret misappropriation and conversion claims, but did not preempt unfair-competition claim to the extent that the latter was based on something other than the misappropriation of a trade secret).

As noted, ARS's evidence for the breach-of-loyalty and fiduciary-duty claim includes his conveying non-pricing information to Boatright – information that, even if not confidential, suggested he was being disloyal to ARS by helping Boatright prepare to win and work the contract (if it should be re-bid).

As to the other e-mails and documents in the record that were sent by Beard to Boatright, they do not constitute trade secrets as defined by MUTSA, so the common-law claims against Beard as to those communications are not preempted.  However, as discussed directly below, these e-mails and documents are not confidential under the common law, so the common-law and contractual confidentiality claims against Beard as to these communications fail on their merits.

After the hearing, ARS provided eleven e-mails that Beard sent to Boatright or Boatright's employee Alison Potts from March 4-19, 2005.  *See* ARS Supp. Filing, Ex. I.  These are the same emails and attachments that Consumers filed as Exhibit V to its opening summary judgment brief.

The court finds that the following ten e-mails – all except the three that arguably transmitted bid/pricing information – clearly do not state, contain, or attach ARS confidential information:

●  First, on Friday, March 4, 2005, at 3:17 p.m., Beard sent Potts an e-mail reading, in its entirety, "look up railroad.net and www.railcarstorage [&] call me if you need help cell 616-610-0056."  It

contained no attachments.  There is no suggestion that the sites were not publicly viewable.

●  Second, on Saturday, March 19, 2005, at 10:44 a.m.  Beard sent an e-mail to Potts that contained only a page from www.aar.org which included entries under the headings "AAR News" and "New on the AAR Web Site."  There is no suggestion that these areas of the site were not publicly viewable.  On the contrary, the top of the webpage reads "Member Login," which suggests Beard was not logged in as a member when he copied the page or its link and sent it to Potts.

●  Third, on Saturday, March 19, 2005 at 10:48 a.m., Beard sent an e-mail to Potts that contained no text.  As provided to the court, both the bottom and the right side of the one-page attachment are cut off.  The fully-visible part is a webpage entitled "EHMS, Equipment Health Management System."  It invites the viewer, "Welcome to EHMS.  Please log in below to access the application."  The screen contains a paragraph reading, in part, "The Equipment Health Management System (EHMS) support the Adv---- Safety Initiative (ATSI).  ATSI is an industry-wide predictive and proa[active?] initiative that uses technology to identify railway equipment problems — that they can be addressed before they result in damage to rail infra[structure &] equipment."  The bottom seems to read "https:ehms.railine.com/RAILINE_ECMS_WEB/login."  The e-mail and attachment do *not* show that Beard provided Boatright with a username and password.  There is no suggestion these areas of the NYAB website were not publicly viewable.  The page suggests Beard was not logged in as a member when he copied the page or its link and sent it to Potts.

●  Fourth, on Saturday, March 19, 2005 at 10:49 a.m., Beard sent an e-mail to Potts that contained no text.  This e-mail attached what appears to be a different webpage from www.aar.org, which included entries entitled "AAR News", "In and Around the Industry" and "New on the AAR Web Site."  There is no suggestion that these areas of the AAR website were not readily viewable by anyone.  The top of the

-36-

webpage has an entry reading "Member Login," which suggests that Beard was not logged in as a member when he copied the page or its link and sent it to Potts.

- Fifth and sixth, on Saturday, March 19, 2005 at 10:51 and 10:52 a.m., Beard sent two e-mails to Potts. One was entitled "Emailing: SearchQuery" and the other "Emailing: Query." Neither e-mail contained any text. The body of each e-mail reads, in its entirety, "Your files are attached and ready to send with this message," and it appears that one of these e-mails forwarded a webpage reading, in pertinent part, "Results for: aar publications. 5 results found . . . ." Two of the search results contain the words "New York Air Brake Corporation a Knorr Brake Company,"and the top of the webpage reads NYAB in large letters, so the court surmises that the webpage came from the New York Air Brake Corporation website. Two of the result summaries appear to deal with Computer-Controlled Brake Generation. Another result is a Slack Adjuster Installation and Maintenance Guide. Another is a pamphlet regarding Repair Track Maintenance of DB-60 Type Freight Brake Equipment. The fifth result is an Operators Manual and mentions "(CSCTD) . . . an AAR approved computerized testing device." There is no suggestion that these areas of the NYAB website were not publicly viewable. It also appears that one of these e-mails forwarded ten of seventeen results from a search run on the website of a Wabtec Corporation for documents matching the query "aar publications." The search results mention items called tension slack adjuster, compression slack adjuster, Mark R-500 Draft Gear, Mark LR Draft Gear, Mark I Draft Gear, Mark H-60 Draft Gear, Mark 558 Draft Gear, Mark 50 Draft Gear, Mark 325 Draft Gear, and Lever Type Hand Brakes. There is no suggestion that this area of the Wabtec Corporation website, its search feature, and the search results shown, were not readily viewable by anyone.

- Seventh, on Monday, March 21, 2005 at 10:53 a.m., Beard sent an e-mail to Potts entitled "Emailing: MTB_EMPL." This e-mail contained no text. It attached a page from an unidentified website.

The page read "Today's new jobs: 1[,] Jobs Available: 44292." It asked, "Who are you...? Click either Employer or Job Seeker below." The bottom of the webpage lists the names and logos of "DLE&G" and "MichiganWorks", and reads "A Public-Private Partnership Serving Michigan's Employers and Workers." There is no suggestion that this area was not readily viewable by anyone.

- Eighth, on Monday, March 21, 2005 at 10:54 a.m., Beard sent an e-mail to Boatright entitled "Emailing: www.grandhaven.com." It contains no text and attaches pages from www.amichiganthing.com which contain ads for a Grand Haven newspaper and links to restaurants, lodging, sightseeing, and the like. There is no suggestion these pages were not publicly viewable.

- Ninth, on Monday, March 21, 2005 at 10:55 a.m., Beard sent an e-mail to Potts that contained no text and was entitled "Emailing: www.thehollandsentinel.net". The body states only "Your files are attached and ready to send with this message." It is unclear which files or webpages, if any, were attached to this email.

- Tenth, on Monday, March 21, 2005 at 10:56 a.m., Beard sent an e-mail to Potts that contained no text. It forwarded a 16-page OSHA publication dated June 1999 and entitled "Study and Recommendations by the Advisory Committee on Occupational Safety and Health regarding 'Women in the Construction Workplace: Providing Equitable Safety and Health Protection.'" There is no suggestion that this publication was not accessible by the public.

Only three of the thirteen Beard-Boatright e-mails in the record require real scrutiny as possible trade-secret or confidential material.

The first e-mail requiring scrutiny is the one sent by Beard on Wednesday, March 9, 2005. On that date at 4:32 p.m., a Billing Specialist from Warren Industries sent Beard an e-mail that read, in its entirety, "Matthew [Beard], Attached is your new wheel sheet per your request. Let me know of any questions or

concerns.  Thank you, [name, address, phone and fax numbers]."  ARS Supp. Filing, Ex I.  Two minutes

later, at 4:34 p.m., Beard forwarded the one-page attachment to Boatright without any message.  *Id.*  About

half an hour later, at 5:02 p.m., Boatright forwarded the e-mail and attachment to his assistant, Allison

Potts, with the message "Ask me about this."  *Id.*

The one-page attachment consists of two tables.  The first has sixteen columns, entitled, from left

to right, Item, Loc, Qty, JCA, QA, CC, W/MADE, DATE, MFG, CL, APP, REM, JCR, QR, RESO, and

SERIAL #.  The "item" column, reading top to bottom, deals with 36" Wheel ___ WHTCP and then CJ

CH J, with this combination repeated four times.  The second table has ten columns, entitled, from left

to right, ITEM, LOCATION, QTY, JCA, QA, CC, QR, JCR, W/MADE, and RESP.  The "item" column,

reading top to bottom, deals with Axle, Axle, Axle, Axle, Bearing, Bearing, Bearing, Bearing, Wheel

Labor (turned), and Jacking Charge.  ARS  provides no guidance as to the meaning of these codes and

acronyms or what Boatright could have learned by seeing them.  Neither table contains a dollar sign or

any number that appears to be a price.  Accordingly, ARS has not shown a genuine issue as to whether this

page contains trade-secret or confidential material.

The second e-mail requiring scrutiny is the one Beard sent to Boatright on Monday, March 21,

2005 at 1:58 p.m.  It forwarded a 15-page attachment which included the following documents:

- Bates stamp DEF 00081-00084, a four-page document entitled BLNG-040-STANDARDIZED BRC [Billing Repair Card]-MI 4-04(1), which is replete with codes and acronyms about which ARS provides  no guidance, making it impossible to reliably ascertain what Boatright could have learned by seeing these tables;

- Bates DEF 00085, a one-page form entitled ARS Safety Meeting and Training Report, which contains empty fields under the headings Location, Date, Meeting/Training Conducted/Certified By, Department, Major Topic, Safety Meeting/Training Session Minutes, and a place to list the Employees Who Attended Safety Meeting/Training Session;

- Bates DEF 00086, a one-page form entitled ARS Calibration Sheer / Form CS-01,

which contains empty fields for Gage [sic] Number, Current Location, Description, Due Date, Last Calibrated, Calibrated By / Title, Results of Last Calibration, Calibration Procedure Used, Outside Service Used, and a place for signature and date;

- Bates DEF 00087, a one-page form entitled ARS In-House Welder Certification / Form IH-01, which contains fields stating "This document certifies that Welder Number ___ Description ___ has been calibrated and tested against Amprobe Instrument ACDC-620T, Manufacture No. 021100477WE, Certification Date ___, Deviation AMPS ___ and has been found within allowable tolerances," and a place for signature and date;

- Bates DEF 00088, a one-page entitled ARS Non-Conformance Report / Form NC-01, which contains empty fields for Report Number, Dated, Supplier, [Part] Description, Part Number, Quantity Inspected, Quantity Rejected, Reason for Rejection, Disposition Requirement, and a place for Date Inspected and Rejected By;

- Bates DEF 00089, a one-page form entitled ARS Master Gage [sic] / Form MG-01, with a table containing columns for Gage Control Number, Gage Description, Date Calibrated, Date Due, and Location;

- Bates DEF 00090, a one-page form entitled ARS Quality Assurance Manual Revision Acknowledgement / Form RAF-01, which states, "The Quality Assurance Manual is being revised as described below. Please insert all new and/or revised documents. Remove and destroy all superseded documents. * * * Please sign and return this form as acknowledgement that you have received and updated the revisions for this manual in your possession as described below.", with appropriate signature and date blanks at the bottom;

- Bates DEF 00091, a one-page form entitled ARS Internal Audit Report / Form IA-01, with empty fields for Functions Audited, Procedure Used, Nonconformances, and Corrective Action Measures, and a place to indicate Corrective Action Completed (circle Yes or No), Completed By, Date, Follow-Up Audit Completed (circle Yes or No), Completed By, Date, and Initial Auditor and Date;

- Bates DEF 00092, a one-page form entitled ARS Quality Assurance Inspection, with empty fields for Date and Plant Location, followed by a table consisting of six columns entitled Car Initial, Car Number, Defect Found, Repaired By, Date Released, and BRC Submitted;

- Bates DEF 00093, a one-page form entitled ARS Single Car Air Test Log, with empty fields for Date In, Date Out, and Location, followed by a table consisting of eight columns entitled Date Tested, Car Initial, Car Number, Passed, Failed,

Repairs Performed to Pass Test, Passed, and Tested By;

- Bates DEF 00094-95, a two-page form table (empty) under the heading "To: Craig G. Allen, Consumers Energy [...] BAD ORDER LIST [...] and Date: ____", and various columns and codes.

The third e-mail requiring scrutiny is the one Beard sent to Boatright on Monday, March 21, 2005 at 2:36 p.m.  It did not attach a separate document, but contained a document as an "in-line" attachment (part of the e-mail itself).  The 11-page inline attachment includes these documents:

- Bates stamp DEF 00096-97 and DEF 000102, a two-page form entitled "Wheel Billing Sheet, Shop Use Only" and an untitled one-page form, each of which contains two tables that appear to be identical or extremely similar to the tables in the "Wheel Sheet" that Beard received from the Warren Industries Billing Specialist and forwarded to Boatright on March 9, 2005, but again with no explanation by ARS;

- Bates DEF 00098, a blank one-page form entitled ARS Purchase Order and containing fields for Company, Purchase Order Number, Contact Person, Verbal or Fax, Freight Class, Shipped Via, followed by a table with columns entitled Quantity, Part Number, Description, Unit Price, and Amount, and below that Subtotal, Tax, Freight, and Total, and finally fields to indicate who received the shipment and when and what condition it was in, and a signature line for "Approved By" and date;

- Bates DEF 00099, a blank ARS form entitled "Bad Order";

- Bates DEF 000100, an ARS form entitled "Brake Shoe Input List" and containing a Location field filled in with "West Olive, Michigan", blank fields for Date, Time In, Time Out, a Why Made Code field filled in with "01", and a table with columns reading Car Number, R1, R2, R3, R4, L1, L2, L3, L4, and Other;

- Bates DEF 000101, an ARS form entitled "Door Hose Input List" and containing a Location field filled in "West Olive, Michigan", blank fields for Date, Time In, and Time Out, and a table with columns reading Car Number, A, B, Quantity, and Other;

- Bates DEF 000103, an ARS form reading "West Olive, Michigan - Request to Pull Bad Order Cars", containing blank fields for Date and Track #, and a table with columns reading Car Initial, Car Number, and Defect;

- Bates DEF 000104, an ARS form entitled "Billing Repair Card", containing blank fields for Car Initial, Number, Arrival Date, Car Type, Blt. Date, Umler [sic] Date, Location, Page __ of __, Resp. Code 1 2 3 (presumably to be circled), Defect Card Y N (presumably to be circled), and JIC Y N (presumably to be circled), followed by a table with columns

-41-

reading Loc, Qty, CC, J.C. App, Q.A. App, Description, W.M., J.C. Rem., Q.A., Resp, Labor, Material, and Net Charge, again with no explanation by ARS for these codes, acronyms, and abbreviations;

● Bates DEF 000105, an ARS form entitled "Air Brake Test Reporting - West Olive, Michigan - Sent for Entering into UMLER [sic]", followed by a table with columns reading Car Initial, Low Car Number, High Car Number, Reporting Mark N F X (presumably to be circled), and Date Air Brakes Tested (with four empty spaces, presumably for month and day, followed by the year 2005 filled in);

● Bates DEF 000106, an ARS form entitled ARS 33" Air Hose Input List, containing a Location field filled in "West Olive, Michigan" and blank fields for Date, Time In, and Time Out, then a table with columns Car Number, A, B, Quantity, and Other.

ARS's CEO stated that his wife and an employee named Pixie Legg spent months creating ARS's forms, but he also said that they created all the forms except a safety form by reference to the AAR field manual, which he agreed was "the Bible when you are dealing with repair shops." *See* MSJ Ex B (Higginbotham) at 106:1 to 107:7; *see also id.* at 108:19 to 109:20 (ARS's office manual derived from the AAR rules, because failure to follow those rules could result in a fine and the cancellation of one's bills). ARS fails to specifically identify how the forms created by the Higginbothams and Ms. Legg meaningfully differed from other companies' versions of such forms, other than variations in the specifications received from a particular customer. Therefore, ARS fails to specifically identify what in these blank forms was "not . . . generally known to, and not . . . readily ascertainable by proper means by" Boatright or others in the railroad industry who could then "obtain economic value from" their disclosure or use. *See* M.C.L. § 445.1902(d)(I) (MUTSA).

On the contrary, ARS's CEO explained that the "wheel sheet", "safety sheet", and other forms are industry-standard forms whose content is largely or wholly dictated by AAR rules:

Q.    ... What is a wheel sheet?
A.    It is for the shop use; whenever a wheel is defective, they write up the defects on the sheet stating that it was a defect of a thin flange or high flange . . . shell tread, and then you have to write in the gauge, the thickness of the wheel.

-42-

Q.     What do you mean you have to?

A.     That's the A.A.R. rules that says you have to write that in.

Q.     So this sheet is in existence because of A.A.R. rules?

A.     Yes.

Q.     And the information that you need to put in there is dictated by A.A.R. rules?

A.     Yes.

Q.     You said there is a safety sheet.  Are there different types of safety sheets?

A.     Yes, on a weekly reporting of a log that you have to keep track of all the safety, anything that you see that comes to attention that needs to change, [be] changed to make it more safer [sic] for your employees to work.

*  *  *

Q.     Bad order card.  Is that something required by A.A.R. rules?

*  *  *

A.     Yes.

Higginbotham 36:25 to 38:19.  ARS's CEO also testified that as plant manager at his prior company, Trinity, he had also used several of the other form types that Beard had e-mailed to Boatright:  a billing repair card (BRC), employee-training forms, air brake test logs, nonconformance reports, and in-house welder certifications.  *See* Higginbotham 35:5 to 36:24 and 41:10.  Moreover, Consumers presents an opinion letter from John Schmitter, whom it presents as an expert in the railroad and transportation industry.  Schmitter opines, in pertinent part,

I have reviewed copies of e-mails that Matthew Beard sent to Boatright Enterprises that ARS claimed included confidential information (Bates numbers DEF 00078 through DEF 00141).  In my opinion these documents do not contain confidential or proprietary information.  Instead they include information that is generally known and available in the railroad industry.

* * * DEF 00078-00084, DEF 00096-00097, DEF 00100-102 and DEF 00104-00106 are blank forms used to list or record railcar repairs.  The codes used on these forms are industry standard railcar repair codes and terms published in the [AAR] Office Manual for AAR Interchange Rules.  This book contains the industry standard railcar repair codes, car repair billing formats and rules and is a key reference used by car shops throughout the United States.  Every car repair client that I have dealt with required that their car repairs and car repair billing conform to the rules in the AAR Office Manual.  As a result, the forms used by individual shops to record repairs are virtually indistinguishable.  These forms contain only industry standard information that is commonly used to record railcar

repairs . . . no ARS specific information.

... DEF 00093-00095, DEF 00099 and DEF 00103 are blank forms used to record the results of air brake tests or to identify railcars requiring repair.  These forms are indistinguishable from forms that I have used and have seen used in the industry.  These forms contain only industry standard information . . . .  None of these documents contain[s] ARS specific information.

... DEF 00085 - DEF 00092 and DEF 00098 are blank forms used by a railcar repair shop to document various activities such as safety meetings, training activities, gauge calibration and quality assurance.  One is a blank purchase order form.  These forms are indistinguishable from forms that I have used and have seen used in the industry.  These forms contain only industry standard information that is commonly used . . . .  None of these . . . contain ARS specific information.

... DEF 00107- DEF 00141 are e-mails attaching pages from publicly available websites.  There is nothing confidential or proprietary in these documents.

* * * [N]one of these documents would help a company secure a proposal for providing railcar repair services to Consumers or anyone else.

Consumers Reply, Ex. A at 1-2.  ARS has not challenged Schmitter's training, experience, and credentials as inadequate to confer expert status.  *See id.* at 4-5 (Schmitter's resume, Areas of Expertise, and Partial List of Clients).  Nor has ARS countered Higginbotham's testimony and expert Schmitter's opinion by explaining what the forms would have taught Boatright about work or billing practices or prices that were peculiar to ARS, let alone how he could obtain economic benefit from that knowledge.  Accordingly, ARS has not shown a genuine issue as to whether the Beard-to-Boatright e-mails of Wed. March 9th 2005 (4:34 p.m.), Mon. March 21st 2005 (1:58 p.m.), and Mon. March 21st 2005 (2:36 p.m.) and their attachments contain trade-secret or confidential material.

**In summary, the court will grant summary judgment to Beard on ARS's claims for breach of the common-law duty of confidentiality, because that claim is preempted by the MUTSA.  Under MUTSA, however, ARS has shown a genuine issue as to whether Beard provided trade-secret information (bid/pricing information) to Boatright.**

-44-

**The court will deny summary judgment as to the remaining claims in counts one and four, namely the claims that Beard breached his common-law duties of loyalty, confidentiality, and fiduciary duty.**  This is based partly on the evidence adduced directly in support of counts one and four, but largely on the evidence introduced in the discussion of the other, unsuccessful claims.  A reasonable jury could find the following:

● During his time as manager of ARS's West Olive shop, Beard had already become close friends with Shane Boatright (a potential competitor of ARS's if the West Olive Shop contract were ever re-bid) and Consumers senior engineer Craig Allen;

● Beard harbored ill will towards ARS as a result of a prior instance where ARS disciplined him, as evinced by his ill-tempered reaction at the time of the discipline;

● Beard knew that Boatright wanted to win the West Olive shop contract if ARS's contract were terminated by whatever means;

● Beard had an explicit or implicit understanding with Boatright that Boatright would hire him and compensate him tangibly if he contributed to a situation where ARS chose to terminate, whether because ARS came to believe that the existing contract was unprofitable or otherwise;

● Beard wanted ARS or Consumers to terminate the contract in order to harm ARS, benefit his friend Shane Boatright, and/or benefit himself;

● In the first three weeks of March 2005, a time that was right before ARS terminated and Beard knew that ARS and Consumers had a rocky relationship, Beard communicated extensively by telephone and e-mail with Boatright (a potential competitor of ARS's if the West Olive Shop contract were ever re-bid);

● These communications were not required by or undertaken in relation to ARS's business dealings with Boatright or by Beard's role as manager of ARS's West Olive Shop;[14]

_____

[14]

Consumers suggests that Beard e-mailed the forms to Boatright because he was investigating a possible joint venture between ARS and Boatright.  *See* MSJ at 11-12 and 18-19; Reply at 5 n.6 ("the phone calls and e-mails between Beard and Boatright had nothing to do with competition with ARS, but rather with the potential sale of cross ties to Consumers (ARS does not sell cross-ties), and the potential to purchase parts from ARS for resale.").  That explanation may be true, but a reasonable jury might reject it for the reasons stated by ARS:

At the time, Mr. Boatright and Kurt Higginbotham were already doing business

-45-

● These communications included home or cellular phones, which could be consistent with a close friendship rather than the merely professional relationship they claimed to have;

● These communications included helping Boatright to prepare to visit Grand Haven to recruit employees to work at West Olive, to avoid legal problems with female employees at the site, and to do the maintenance and repair work needed at that shop (which Beard knew Boatright lacked the experience to do, contrary to the lies Boatright told Consumers when he competed for the re-bid);

● Although there is no direct, conclusive evidence that the disgruntled Beard provided Boatright with ARS's pricing information, Boatright's bid included a labor rate that was *one cent* different from ARS's proposed labor rate for a substantial part of the new contract period; rather than coincidence, this shows that Beard must have passed information to Boatright that enabled his friend to craft a bid that essentially matched or beat ARS's bid in all important respects;

● Beard assured ARS that there was no wheelset overcharge dispute, when he knew that there was such a dispute and that failing to timely resolve the dispute could sour ARS's relationship with Consumers and lead to one side or the other terminating the contract;

● Beard assured ARS that a certain labor rate was "safe" to win the re-bid, when he knew that Boatright would submit a bid containing a lower labor rate;

● Beard told ARS that he could not recall the name of the fifth bidder, when he knew that the fifth bidder was Boatright;

● Beard hid the fact that Boatright was a bidder because he feared that if ARS knew Boatright was a bidder:

(1)   ARS would suspect that he was helping his friend at ARS's expense, which could lead ARS to fire and sue Beard;

(2)   ARS, knowing that Boatright lacked the experience to work the Consumers West Olive shop as competently as ARS worked it, would point out Boatright's actual inexperience to Consumers; and

_____

together in Florida – Higginbotham was renting railcar storage space from Boatright. [Ex. 1, Higginbotham. at 143]. According to Boatright and Beard, they were not in regular contract, nor were they friends. Why would Boatright – the President, CEO and resident entrepreneur of Boatright Enterprises – not have simply contacted Kurt Higginbotham, his counterpart at ARS, rather than calling his non-friend Matt Beard who was supervising a railcar repair shop in Michigan having nothing to do with a generalized parts business, in order to propose this purported scheme involving the mark-up of parts to be sold to Boatright's short-line railroad customers?

ARS Opp'n at 35 n.16.

(3)    Consumers then would not award the new contract to Boatright, whether because he lied on his resume or because he lacked the requisite experience or both, *see* ARS Sur-Reply, Ex B (Deposition of Brian D. Gallaway dated Oct. 24, 2007 ("Gallaway Dep") at 79:9 to 80:17 (on cross-examination regarding April 22, 2005 letter from Allen to his boss Gallaway, the latter testified that if he had known that Boatright did not have any experience operating a railcar repair shop, as opposed to the ten years experience he claimed, "it probably would have made a little difference.").

• While ARS still had the Consumers contract and Beard was still employed by ARS, Beard went to a Ford dealership and indicated, in writing, that he was an "agent" of Boatright Enterprises, and purchased an expensive vehicle for his own use on Boatright's credit and account;

• After ARS terminated and Boatright won the re-bid, Boatright promptly hired Beard, *see* ARS Sur-Reply Ex D (Beard's resume submitted to Boatright in 2005); made the exorbitant lease payments ($749/month) on an expensive (almost $45,000) truck used by Beard; and gave him a sizable raise (over $57,000 in 2006 versus about $48,000 in 2004, *see* ARS Sealed Ex C at 1).

The evidence that Beard accepted a vehicle from Boatright (without informing ARS)[15] while still employed by ARS may be particularly relevant, because the jury could reasonably construe that as a *quid pro quo* for effectively secretly working for Boatright, and against ARS's interests, while on ARS's payroll.

That distinguishes him from employees who merely investigate the possibility of moving to a competitor without acting against their current employer's interest, let alone accepting compensation for doing so.  In *Hyland v. A.L. Belrose Co., Inc.*, 2004 WL 1178423 (Mich. App. May 27, 2004), for example, plaintiff was a sales representative for the defendant before he left to work for one of its customers. Feeling betrayed, the defendant refused to pay commissions on sales that plaintiff completed before he left, and plaintiff sued for the unpaid commissions.  The trial court granted judgment to the plaintiff as to the

---

15

*Contrast H.J. Tucker & Assocs., Inc. v. Allied Chucker & Eng. Co.*, 595 N.W.2d 176, 188 (Mich. App. 1999) (affirming finding that representative did not breach duties of fair dealing and loyalty to manufacturer-employer where representative's corroborated testimony showed that he fully disclosed to manufacturer that he was representing other companies and the manufacturer indicated that it did not object so long as that did not take business away from it).

completed sales, and the Court of Appeals affirmed:

> The trial court did not err by awarding plaintiff commissions on all but one of the sales [which was cancelled] that he generated prior to his resignation because plaintiff was entitled to these commissions.  He did not breach either the terms of his employment contract or his duty of loyalty to the defendant.  Plaintiff did not act in a "dual capacity" because he did no sales work nor did he "enter into any business relationships with manufacturers until long after he discontinued" working for defendant.  While still employed with defendant, plaintiff merely probed the possibility of working for VDD, defendant's largest customer, after leaving defendant . . . .  But, nothing developed from this inquiry, and it alone does not mean plaintiff acted in a "dual capacity."

*Id.* at \*1.  The Supreme Court affirmed that portion of the decision, 690 N.W.2d 99, 2004 WL 2989041 (Mich. Dec. 27, 2004) (unpub. table decision).  By contrast, a reasonable jury could find that Beard entered into a business relationship with Boatright, acted to advance Boatright's interests at the expense of ARS's, and accepted compensation therefor while he was still employed by ARS.

Thus, if the jury made the findings listed above, as permitted by the record, it could reasonably conclude that Beard breached his duty of loyalty and fiduciary duty to ARS.[16]  *See Wysong Corp. v. M.I. Indus.*, 412 F. Supp.2d 612, 624 (E.D. Mich. 2005) ("An employee breaches a duty of loyalty . . . by competing against his employer without fully disclosing his interest in the competing enterprise.") (citing *Kingsley Assocs., Inc. v. Del-Met, Inc.*, 918 F.2d 1277, 1283 (6th Cir. 1990) (quoting *Seeney & Moore v. Chapman*, 294 N.W. 711, 712-13 (Mich. 1940) ("the law will not permit an agent to act in a dual capacity in which his interest conflicts with his duty, without a full disclosure of the facts to his principal."))); *Clark & Gregory v. Hanson*, 225 B.R. 366, 375 (Bankr. W.D. Mich. 1998) ("common law imposes a duty of

---

[16]

If Beard did violate MUTSA and/or breach his duty of loyalty / fiduciary duty, it is unclear whether a reasonable jury could find that the breaches were a causative factor *in Boatright winning the re-bid* (and in Boatright being prepared to prepare to perform and actually perform under the re-bid contract).  It is a separate question whether Beard's breaches were even a partial causative factor *in ARS's decision to terminate the existing contract*.

loyalty on employees, forbidding them from taking action contrary to the interests of their employers").

## Spoliation of Evidence

### (Count 5 - Against Matthew Beard only)

ARS alleges that its former employee Matthew Beard destroyed or tried to destroy evidence of his breaches of his confidentiality and loyalty obligations and his conspiracy with co-defendants to interfere with the ARS-Consumers contract. Specifically, ARS alleges that Beard installed software on an ARS computer and used it to try to remove all traces of e-mail correspondence between him and Boatright, including an e-mail by which he forwarded confidential pricing information. ARS has recovered some Beard-Boatright e-mails, but others may not be recoverable. Am. Comp. ¶¶ 100-104. Consumers admits Beard sent e-mails to Boatright from an ARS computer that was used by several ARS employees, but they deny that any of the e-mails had anything to do with the ARS-Consumers contract or contained confidential information. Ans. ¶¶ 100-104.

Consumers contends that Michigan law does not recognize a cause of action for spoliation of evidence. MSJ at 23 (citing *Panich v. Iron Wood Prods. Corp.*, 445 N.W.2d 795, 798 (Mich. App. 1989) (Richard Allen Griffin, J.) (declining to recognize a tort of intentional interference with a prospective civil action by spoliation of evidence)).

ARS points to no Michigan Supreme Court or Court of Appeals decision holding that an independent cause of action for spoliation exists or should be recognized, nor has this court located any. ARS merely points out that the Court of Appeals decision cited by Consumers, *Panich*,

> did not hold that Michigan would not recognize such a cause of action. To the contrary, the court declined to recognize an independent cause of action for spoliation under the facts of that case but left open the possibility that it may recognize such a cause of action should it be presented with the right set of facts.

ARS Opp'n at 46. Only one member of the three-judge panel in *Panich* indicated support for recognizing

an independent cause of action, and he was expressly writing *in dissent* on that score:

> *I dissent from the majority's holding that there is no common-law duty owed by an employer to preserve evidence for an employee's third-party potential third-party action.* However, I concur with the majority that the facts of this case do not establish that defendant intentionally destroyed evidence necessary for plaintiff's potential third-party cause of action.

*Panich*, 445 N.W.2d at 799 (Murphy, P.J., concurring in part and dissenting in part) (emphasis added).

Moreover, that member of the *Panich* panel conceded that neither of the potential spoliation tort causes

of action at issue have been recognized in Michigan yet:

> I believe it is important to note that there are two separate and distinct torts which are potentially at issue in this case, *neither of which has yet been recognized in Michigan*. These torts are (1) the negligent failure to preserve evidence for civil litigation and (2) the intentional interference with a prospective civil action by spoliation of evidence. The fact that these torts have not yet been adopted in Michigan is certainly no bar to the state's jurisprudence recognizing them.

*Id.* (emphasis added, footnotes omitted).

A federal court, of course, may not "take sides" in state judges' debate over the proper evolution

of their State's common law. Therefore, this court intimates no opinion as to whether the *Panich* majority

or Judge Murphy's dissent reached the conclusion that was more logical, more just, or more consonant

with the letter and spirit of Michigan Supreme Court decisions regarding the recognition of new tort causes

of action. Even assuming *arguendo* that the *Panich* dissent had the better argument, a dissenting opinion

*by definition* cannot serve as a basis for predicting that the Michigan Supreme Court would adopt the rule

urged unsuccessfully by that dissent.

ARS's only other argument regarding the viability of count five is the correct but minimal assertion

that "[t]he possibility that a separate cause of action for spoliation *may* be recognized under Michigan law

should the right set of facts present itself has been raised in at least one other recent decision." ARS Opp'n

at 46. ARS cites *Ace Am. Ins. Co. v. Emmet Coating Servs., Inc.*, 2006 WL 3826988 (Mich. App. Dec.

28, 2006), which merely upheld the determination that a spoliation claim was not so frivolous as to warrant

sanctions. The *Ace* panel wrote:

> Although Michigan law recognizes a duty to preserve evidence . . . there is no published authority in Michigan expressly recognizing or rejecting a claim for spoliation of evidence as a valid cause of action in this state. The substantive requirements for such a claim have not, therefore, been settled or even expressly considered by any binding Michigan authority.
>
> Under such circumstances, to award defendant sanctions on the ground that the facts evinced by the record fail to meet the substantive requirements for a claim of spoliation of evidence is speculative at best. In the absence of authority expressly recognizing and delineating the requirements for successfully prosecuting a claim for spoliation of evidence, it cannot be said that plaintiff's claim was devoid of arguable legal merit at the time it filed its complaint. *See, e.g., Travelers Ins.* . . . (declining to find the plaintiff's claim "devoid of arguable legal merit" where the viability of its claim was not settled by published legal authority). The trial court did not, therefore, clearly err in failing to award sanctions on that ground.

*Id.* at *3. The Supreme Court declined to review the decision, 731 N.W.2d 746 (Mich. 2007).

Moreover, all the Michigan state-court decisions that have cited *Panich* on this issue either refuse

to create an independent cause of action for spoliation of evidence or decline to address the issue.[17] For

example, in *Helzer v. CBS Boring & Machine Co., Inc.*, 1999 WL 33441300 (Mich. App. June 8, 1999),

a workplace injury case, the panel reasoned that the availability of a jury instruction on the adverse

inferences that may be drawn from spoliation obviated the need to create an independent cause of action

for spoliation. The *Helzer* panel wrote:

> Plaintiff also argues that the trial court erred in granting summary disposition to both defendants . . . on her [claim for] intentional interference with a prospective civil action by

---

[17]

    *See, e.g., Wilson v. Sinai Grace Hosp.*, 2004 WL 915049, *5 (Mich. App. Apr. 29, 2004) ("If this were a complaint for spoliation of evidence, *which it is not*, it would be ripe for recognition as an independent tort in medical malpractice actions. However, in this case, plaintiffs' claims are explicitly affirmed on the basis of defendants' statutory duty [pursuant to M.C.L. § 333.20175(1), to keep certain medical records, and, pursuant to § 2912b(5), to provide such records to a patient upon written notice that the patient intends to file a medical-malpractice claim].") (emphasis added).

-51-

spoliation of evidence.  We disagree.  Specifically, plaintiff asserts that defendants had David Brom switch the electrical plugs to their correct positions after the accident so as to conceal the fact that the plugs were in their incorrect positions when plaintiff was electrocuted. [T]he trial court relied upon *Panich* . . . in stating that Michigan does not recognize the tort of intentional interference with a prospective civil action by spoliation of evidence.

In *Panich* . . . the plaintiff was injured at work when an electrical box exploded.  During the plaintiff's absence from work, the defendant, plaintiff's employer, disposed of the electrical box.  *Id.* at 138.  The plaintiff sued the defendant, alleging negligence and intentional interference with an economic advantage.  *Id.*  The plaintiff asserted that the defendant intentionally disposed of the electrical box after knowing that the plaintiff had a potential third-party claim against the manufacturer of the box.  *Id.*  [T]his Court declined to create such a tort.

Although plaintiff may be correct in stating that *Panich* is distinguishable from the present case because it was not in the defendant's interest in *Panich* to destroy the evidence where in the present case, it was in defendant CBS' interest, Michigan has already devise a method for dealing with such situations.  "The rule is well established that where there is a deliberate destruction of or failure to produce evidence in one's control[,] a presumption arises that if the evidence were produced[,] it would operate against the party who deliberately destroyed or failed to produce it." * * * *We conclude that, this remedy being available, no separate intentional interference/spoliation claim need be recognized.*

*Id.* at *4.  *See also Adkins v. Wolever*, – F.3d –, –, 2008 WL 746347, *2 (6[th] Cir. 2008) ("At present, the tort of spoliation is not available in Michigan.") (citing, *inter alia*, *Panich*); *Calvin v. GMC*, 1997 WL 33340259, *3 (Mich. App. Nov. 4, 1997) ("[C]ount two is essentially a claim of spoliation . . . .  This tort has not been recognized in Michigan."); *Gill v. Lochriccio*, 2006 WL 891463, *4 (E.D. Mich. Mar. 30, 2006) (citing *Panich* and stating, without further discussion, "The tort of spoliation is not available in Michigan.").[18] [19]

---

[18]

One Sixth Circuit judge asserted in concurrence, "there is no suggestion that Michigan would not provide a remedy in tort for the wrong alleged here," which was the cover-up of the identity of a driver involved in a collision that injured the plaintiff-pedestrian.  *Swekel v. City of River Rouge*, 119 F.3d 1259, 1265 n.1 (6[th] Cir. 1997).  That assertion, however, cited no Michigan authority.

[19]

Because ARS's spoliation claim fails as a matter of law, the court has no need to refer to Consumers' post-hearing submission of expert opinion that assails the spoliation claim on *factual*

Accordingly, the court will grant summary judgment to defendant Matthew Beard on count five, spoliation of evidence.

## BREACH OF CONTRACT

### (Count 6 - Against Consumers Energy Only)

The Parties' Arguments

ARS contends that Consumers breached the contract by unilaterally changing its terms in several ways:

(1)     by requiring that ARS reimburse Consumers for wheel repair charges in excess of the agreed-upon formula (First Am. Comp., ¶ 111);

(2)     by insisting that ARS perform additional services beyond the scope of the contract without additional compensation (such as constructing a new building) (First Am. Comp., ¶ 112);

(3)     by attempting to control ARS's performance in violation of Section 5 by insisting on an OT schedule (First Am. Comp., ¶ 112); and

(4)     by breaching its duty of good faith and fair dealing through the misuse of its discretion to audit ARS's records and determine when it is entitled to a refund (First Am. Comp., ¶ 113).

ARS's Opp'n at 51.  Consumers responds that ARS cannot show any breach of the contract.  Namely, Consumers points out, "ARS does not claim that Consumers *actually required* ARS to reimburse Consumers for wheel repair charges . . . or actually perform any additional services without compensation."  MSJ at 23.  Moreover, Consumers argues that "ARS cannot overcome the fact that it voluntarily terminated the contract."  *Id.* at 24.  Consumers also contends that "Michigan does not recognize a claim for breach of an implied covenant of good faith and fair dealing.  In any event, ARS

grounds.  *See* Defs.' Feb. 2008 Filing, Ex. B (Morgan Dep) at 26-27, 34-36, 41 and 47.

cannot offer any evidence of bad faith on the part of Consumers in its dealings with ARS under the Contract." *Id.* (citations omitted).

<u>Michigan Common Law Regarding Breach of Contract</u>. A plaintiff seeking to recover for breach of contract must prove that a contract existed between the parties, the defendant breached the contract, and the breach damaged the plaintiff. *Rausch v. Yeo*, 2007 WL 162569, *2 (Mich. App. Jan. 23, 2007) (citing *Lawrence v. Will Darrah & Assocs, Inc.*, 516 N.W.2d 43 (Mich. 1994)). None of the parties disputes that the ARS-Consumers agreement was a valid, enforceable contract.[20]

In Michigan, contracts are enforced according to their terms, and this rule is a "corollary of the parties' liberty to contract." *Coates v. Bastian Bros., Inc.*, 741 N.W.2d 539, 543 (Mich. App. 2007) (citing *Rory v. Continental Ins. Co.*, 703 N.W.2d 23, 30 (Mich. 2005) ("Courts enforce contracts according to their unambiguous terms because doing so respects the freedom of individuals freely to arrange their affairs via contract.")). When interpreting a contract, Michigan courts give terms their "plain and ordinary meaning, avoiding technical or constrained constructions." *Coates*, 714 N.W.2d at 543 (citing *Wilkie v. Auto Owners Ins. Co.*, 664 N.W.2d 776, 780 (Mich. 2003)). The parties do not contend that any of the contract's terms was ambiguous.

To establish a breach, the plaintiff must show that the other party failed to perform a duty, "whether imposed by a promise stated in the contract or by a term supplied by the court." *Hesse ex rel. Estate of Hesse v. Chippewa Valley Schs.*, 2001 WL 789540, *2 (Mich. App. Jan. 12, 2001) (citing *Woody v. Tamer*, 405 N.W.2d 213, 216 (Mich. App. 1987) (giving the duty of good faith and fair dealing as an example of "a term supplied by the court") (citing RESTATEMENT 2D OF CONTRACTS §§ 204, 205, and 235))).

---

[20]

    *See Hess v. Cannon Twp.*, 696 N.W.2d 742, 748 (Mich. App. 2005) ("The essential element of a valid contract are . . . (1) parties competent to contract, (2) a proper subject matter, (3) a legal consideration, (4) mutuality of agreement, and (5) mutuality of obligation.") (citation omitted).

None of the Conduct Cited by ARS Constitutes Breach of Contract. It is unnecessary to determine whether the Supreme Court would recognize a cause of action for breach of an at-will contract outside the employment context.[21]  Based on a recent published decision by a seven-member "special panel" of the Michigan Court of Appeals, *see* MICH. CT. R. 7.215(J)(3), this court assumes *arguendo* that the Supreme Court would allow recovery of more-than-nominal damages for breach of an at-will commercial contract. The special panel held,

> [A] blanket rule limiting recovery to nominal damages as a matter of law in all actions arising out of or related to the termination of at-will contracts is not legally sound.  There may exist factual scenarios in which there is a tangible basis on which future damages may be assessed that is not overly speculative despite the at-will nature of the underlying contract.  Indeed, this case presents such a situation when viewing the evidence in a light most favorable to plaintiff . . . .

*Health Call of Detroit v. Atrium Home & Health Care Servs., Inc.*, 706 N.W.2d 843, 858 (Mich. App. 2005) (Special Panel) (reversing grant of summary disposition on corporate home-healthcare-services provider's breach-of-contract claim against competing corporation).

This court also assumes *arguendo* that the Supreme Court would recognize a cause of action for breach of contract based on one party's conditioning its continued payment or other performance on the other party doing more than the contract requires, thereby unilaterally changing the contract's terms.  *See generally Quality Prods. & Concepts Co. v. Nagel Precision, Inc.*, 666 N.W.2d 251, 253 (Mich. 2003) ("the principle of freedom of contract does not permit a party unilaterally to alter the original contract"); *see, e.g.,* applying Michigan law, *Chainworks, Inc. v. Webco Indus., Inc.*, 2006 WL 461251 (W.D. Mich.

---

[21]  Michigan cases regarding breach of an at-will contract typically arise in the employment context, not a contract between corporations. *See, e.g., Pedell v. Heartland Healthcare Ctr.*, 2007 WL 840876 (Mich. App. Mar. 20, 2007); *Liddy v. GMC*, 2005 WL 2292676 (Mich. App. Sept. 20, 2005).

Feb. 24, 2006) (requirements contract obligated defendant to provide as much steel tubing as requested by plaintiff through purchase orders during 2004 for a specified price; by expressly refusing to continue shipping unless plaintiff paid a surcharge, defendant breached), *recon. denied*, 2006 WL 1521946 (W.D. Mich. May 31, 2006); *Holland v. Earl G. Graves Pub. Co., Inc.*, 46 F. Supp.2d 681 (E.D. Mich. 1998) (by unilaterally increasing the amount of ad revenue that salesperson had to obtain to earn award, above that specified in contract, the employer breached).[22]

Even with these assumptions about Michigan law, none of Consumers' conduct (as described by ARS) would constitute a breach of contract. Accepting ARS's version of events and taking its factual allegations as true, no reasonable factfinder could find that Consumers unilaterally changed the terms of the contract. Namely, no reasonable factfinder could find that Consumers *required* ARS to render performance of a type, or to a degree, not required by the contract's terms.

First, ARS alleges that Consumers breached the contract by "requiring that ARS reimburse Consumers for wheel repair charges in excess of the agreed-upon formula [Am. Comp. ¶ 111] . . . ." ARS's Opp'n at 51. The following facts, however, are undisputed:

(1)     following negotiations in September 2002, the contract price of $800 per wheel set reflected ARS's cost plus 15% ($684.25) and an additional $115.75 to reimburse ARS for a scrap-metal surcharge that it would have to pay its wheel-set supplier, *see* MSJ Ex. G (Allen letter dated March 1, 2005);

(2)     in January 2003, Allen agreed that Consumers would pay ARS an additional $200 per wheel set as reimbursement for a scrap-metal surcharge, *see* Allen at 93 and Ex. G (Allen Mar. 1, 2005 letter);

---

[22]

Most Michigan decisions addressing claims of breach due to alleged unilateral modifications arise in the employment context. *See, e.g., Briney v. Kelsey-Hayes*, 2001 WL 951624, * (Mich. App. Aug. 21, 2001) (affirming jury verdict finding employer liable for breach by unilaterally changing vacation policy and thereby depriving some employees of "vested" right to vacation time accrued under employer's previous vacation-policy memorandum).

(3)    The record does not contain any writing signed by Consumers' CEO, CFO, COO, VP of Fuels & Electric Transmission, or Director of Fuels Transportation & Planning approving or ratifying Allen's agreement;

(4)    In December 2004, Allen realized Consumers had left the $115.75 surcharge premium in the contractual wheelset price, while also reimbursing ARS for the $200 surcharge he had agreed to in January 2003, *see* Allen 90-91;

(5)    On January 25, 2005, Allen e-mailed ARS's accountant that the wheels from that point forward were to be invoiced only at the cost plus 15% rate, and should not include the additional any other charges, *see* MSJ Ex. H;

(6)    Allen asked ARS to refund the extracontractual wheelset surcharges it had been paying since January 2003, and his refund request letter stated that the excess surcharges totaled approximately $200,000, *see* MSJ Ex. G (Allen March 1, 2005 letter) and Zoller 135;

(7)    At a March 14, 2005 meeting in Grand Haven, Zoller "responded to the allegation of wheel set repair overcharge by reminding Mr. Allen that at the outset of the contract Mr. Allen himself had decided how ARS should charge for these repairs. He repeatedly asked Mr. Allen to confirm that he and Kurt Higginbotham had agreed to the charge for wheel repairs, but Mr. Allen would not respond. Rather, he continued to state that where there is a dispute, the written contact controls." ARS's Opp'n at 16-17, citing Ex. 17 (Zoller) at 133-36 & 139-40 and Ex. 23 (Allen's Mar. 14, 2005 notes).

(8)    ARS denied that it owed a refund for excess wheel-set charges, but it started charging only $200 surcharge per wheel set instead of $315.75, *see* Allen 97;

(9)    From January 2003 through January 2005, while ARS was only being charged a single $200 scrap surcharge by its wheel-set supplier, Consumers was paying ARS $315.75 per wheel-set as surcharge reimbursement, which was beyond the surcharge reimbursement amount required by the contract ($115.75) and beyond the surcharge reimbursement amount agreed to by Allen in January 2003 ($200);

(10)   In April 2005, during the period after ARS's termination but before Consumers' award of the re-bid, ARS and Consumers agreed that ARS would pay Consumers $25,000 to settle the wheel-set surcharge payment dispute;

(11)   ARS never paid anything to Consumers to settle the wheel-set dispute;

(12)   Consumers has never sued ARS to recover amounts paid to ARS that were called wheel-set surcharges or reflected reimbursement for such charges.

In light of these undisputed facts, it is specious for ARS to argue that Consumers "required" ARS to reimburse Consumers for "wheel repair charges in excess of the agreed-upon formula . . . ." ARS's Opp'n at 51 (citing Am .Comp. ¶ 111).

ARS seems to imply that Allen began pressing the issue of extracontractual wheelset charges more aggressively on March 1, 2005, because of some combination of (1) his general animosity against, and personality conflict with ARS's new COO, (2) his frustration that ARS refused to build an addition at West Olive at its own expense or have its West Olive employees work OT, (3) his anger that ARS's new COO was not paying sufficient attention to a major customer like Consumers, and (4) his belief that ARS was not treating Beard well enough.  ARS explains,

> Phillips began working for ARS as [COO] on November 29, 2004. [W]ithin a month . . . ARS began to receive reports that Allen was complaining to other customers that Phillips had not yet visited him. [*See* Ex. 16 (Phillips's Notes)].  Phillips twice called Allen and offered to come to Michigan immediately, but Allen assured him that the end of February would be soon enough to meet.  He reminded Phillips, however, of his view that "I am your biggest customer." [T]he meeting was set for February 28, 2005 . . . .  Zoller cancelled because of inclement weather, but, concerned about reports that Allen had been upset with him, Phillips was determined to go.

> When Phillips arrived . . . , he shook Beard's hand and extended his hand to Allen, but Allen would not shake his hand.  Naturally, this was disconcerting, but Phillips continued with the meeting . . . . * * * Allen explained his view that ARS could benefit by constructing the building addition he wanted.  He also supplied a two-page document describing his impression of ARS's finances and his estimate of what it would cost ARS to build the addition.

> When Mr. Phillips explained that the draft did not account for certain ARS expenses, and that he needed more time to evaluate the proposal, Allen responded in an irritated manner and said "Well, let's just re-bid the contract then." [*Id.*]  The meeting deteriorated further when Allen commented that ARS could build the building if it were not paying Phillips's salary.  Allen pushed for more overtime work.  Phillips offered to have Matt Beard work some additional hours if truly necessary.  Allen rejected this suggestion, and again pushed for ARS to re-bid the contract.

> After this meeting, Allen and Phillips went to dinner.  . . . Allen continued to discuss

terminating and re-bidding the contract and stated that Phillips should not be making so much money.  Rather, he said, Matt Beard should have been given Phillips's COO job. Allen also requested that ARS provide Matt Beard with a new truck and give him a raise. According to the notes that Phillips made after the meeting:

> He stated that making Matt happy was high on his priority list and if I couldn't make Matt happy that he might re-bid the contract. ...  He said he was a wealthy man and he wanted the same for Matt.

> *Id.  The next day, March 1, 2005, Allen raised the stakes* by sending a letter to ARS alleging that Consumers had been overcharged $200,000 for wheel set repairs and was owed reimbursement by ARS. [Ex. 21 . . . .]  He had not mentioned this to Phillips the day before. [Ex. 17, Zoller. 132:1 - 134:9.]

ARS's Opp'n at 13-15 (emphasis added, first names and titles omitted); *see also id.* at 11 ("When ARS continued to resist both demands [the addition and OT], Allen began to turn up the heat.  During the first two weeks of January 2005, Allen telephoned Higginbotham and left a voicemail message to the effect that there was a 'wheel problem issue and there was an overcharge.'").

The court intimates no opinion as to whether a reasonable factfinder could find that ARS's suspicions about Allen's motivations for pressing the wheelset charge issue were well-founded.  Whether Allen harbored these particular motivation(s) for initiating or pursuing the wheelset surcharge dispute is irrelevant to the viability of ARS's theory that Consumers breached the contract by trying to unilaterally change the contract's wheelset price term.

The fact remains that ARS never in fact reimbursed any extracontractual wheelset charges, and it suffered no tangible consequence (or unequivocal threat of a tangible consequence) whatsoever as a result. For example, Consumers did not exercise its right to terminate the contract, nor did it withhold partial payment for other services as a means of recouping the extracontractual wheel-set surcharges.  Indeed, ARS has not produced evidence showing a genuine issue that Consumers even unequivocally *threatened* to withhold other payment or terminate the contract if ARS refused to refund the excess wheel-set

surcharges.  This amply distinguishes our case from *Chainworks*, where the defendant steel supplier expressly warned that it might well stop shipping steel tubes to the plaintiff if the plaintiff did not pay charges beyond the contractually fixed price.

The court particularly notes ARS's own characterization of the ARS-Consumers discussion regarding wheelset surcharges at the March 14, 2005 meeting in Grand Haven – and, for purposes of this motion, accepts that characterization.  ARS alleges that when its VP Zoller reminded Allen that he and ARS CEO Higginbotham had agreed (post-contract) to the additional charge for wheel repairs, Allen would say only that "where there is a dispute, the written contact controls."  ARS's Opp'n at 16-17, citing Ex. 17 (Zoller) at 133-36 & 139-40 and Ex. 23 (Allen's Mar. 14, 2005 notes).  Allen's position is the quintessential invocation of a party's right to render only the performance required by its written contract (absent a valid modification).  Consumers was within its rights to refuse to make payments not required by the contract, because the contract provided as follows:

> **14.  Changes in the Work or in the Contract.**
>> (b)  Authorized Agents – *Work* may be authorized, altered, added to or reduced by the following Consumers' Agents so long as the work authorized does not change the extent or scope of work outlined in the Purchase Order applicable to the Request or JIC issued for the particular job.
>>
>>> (I)  Vice President of Fuels and Electric Transmission, or another Officer of Consumers
>>> (ii)  Fuels Transportation and Planning Director
>>> (iii)  Senior Engineer (Railcar Management)
>>> * * *
>> (d)  Changes in Contract – *No changes shall be made in the terms of this Contract except in writing, signed by an officer of Consumers*, and by an officer or other duly authorized representative of the Contractor.
>> * * *
>
> **17.  Entire Agreement**
> With respect to the subject matter hereof, *this Contract . . . constitutes*, with the applicable Purchase Orders, Requests and JICs[23] hereunder, *the entire agreement between the Parties*.

---

[23]JIC stands for Joint Inspection Certificate.  *See* Contract ¶ 1(a)(ii).

Contract at 10-11 (italics added, boldface original).  ARS does not attempt to show that the above-quoted language permitted Allen to effect a valid modification of the contractual wheelset price term.

It is unclear if there is some writing *signed* by Allen that purports to bind Consumers to pay the additional wheelset surcharge.  But even if there is such a writing, it could not effect a valid modification of the contract because Allen was a senior engineer, not the CEO, CFO, COO, President, VP, or other "officer" of Consumers.  ARS makes no argument, and cites no authority, for the notion that Allen was a *de jure* or *de facto* "officer" of Consumers when he signed any writing agreeing to the additional wheelset surcharge.  *See generally Martin v. Miller*, 57 N.W.2d 878 (Mich. 1953) (applying concept of *de facto* corporate officer, with little discussion); *see, e.g., In re Andrews*, 252 N.W. 482 (Mich. 1934) (although corporation's by-laws required directors to be stockholders, duly-elected directors who had disposed of their stock but continued to act as directors were deemed to still be *de facto* directors whose petition for dissolution of corporation conferred jurisdiction upon the court to decree dissolution); *DeHoop v. Peninsular Life Ins. Co.*, 159 N.W. 500 (Mich. 1916) (although the person who sold stock was not registered as an agent as required by the statute then in effect, if in selling he acted in the name of the president, who was registered, he was a de facto agent and the stock sale was lawful).[24]  Moreover, where

---

[24]

Ordinarily, this court will not consider arguments raised for the first time in a reply or sur-reply brief.  *Randy Disselkoen Props. v. Cascade Twp.*, 2008 WL 114755, *11 n.23 (W.D. Mich. Jan. 9, 2008) (Maloney, J.) ("[I]ssues raised for the first time in a reply brief are not properly part of a summary judgment motion.").  *A fortiori*, this court will not entertain any new arguments, theories, or evidence that ARS might seek to advance by way of another supplemental post-hearing filing, a motion for reconsideration, or a motion for relief from judgment (such as an argument that Allen was a *de facto* officer when he signed a writing obligating Consumers to pay wheelset charges not contained in the original contract).  *See Scottsdale Ins. Co. v. Flowers*, 513 F.3d 546, 553 (6th Cir. 2008) ("[W]e have found issues to be waived when they are raised for the first time in motions requesting reconsideration or in replies to responses.") (citation omitted); *Thurman v. Yellow Freight Sys., Inc.*, 97 F.3d 833, 835 (6th Cir. 1996) (issue was waived where not raised until motion to alter or amend judgment); *Am. Meat Inst. v. Pridgeon*, 724 F.2d 45, 47 (6th Cir. 1984) (issue was waived where not raised until motion to reconsider issuance of injunction).

the contract does address the authority of the senior engineer in charge of railcar management, it authorizes him only to make limited changes to the *work* to be done, *not* changes to the price. *See* Contract at 10 ¶ 14(b).

Absent evidence that an officer of Consumers signed a writing that validly modified the contract to require the additional wheelset surcharge, the record discloses no basis for concluding that Consumers was legally obligated to continue paying it. Allen's statement at the March 14, 2005 meeting – and Consumers' position on the surcharge throughout the dispute – is nothing more than a refusal to pay more than the written contract required. That is a far cry from attempting to "unilaterally change" the terms of the contract.

Consequently, Consumers' actions and statements with regard to the wheel-set surcharges could not reasonably be considered an attempt to unilaterally change the terms of the written contract, and ARS's first ground for its breach-of-contract claim fails.

Second and third, ARS alleges that Consumers breached the contract by "insisting that ARS perform additional services beyond the scope of the contract without additional compensation (such as constructing a new building)" and by "attempting to control ARS's performance in violation of Section 5 by insisting on an overtime schedule . . . ." *See* ARS's Opp'n at 51 (citing Am. Comp. ¶ 112). Section 5 of the contract, entitled Independent Contractor, provides, in its entirety,

> In the performance of the work under this Contract, the Contractor shall be an independent contractor and shall perform said work with and according to its own equipment, means and methods, which shall belong to and be and remain in the exclusive charge and control of the Contractor, and which shall not be subject to any control or supervision by Consumers except as to the results of said work; and it is expressly understood that Consumers does not hereby hire or rent the use of the same, or assume any liability for the use or method of use thereof.

ARS's Opp'n, Ex. 15. ARS further argues that

> [d]espite the fact that ARS was an independent contractor under the terms of the ARS-Consumers contract, and as such, was entitled to perform its work without being subject to the control or supervision of Consumers except as to results, Craig Allen repeatedly pressured ARS to construct a building addition and to pay for its employees to work more overtime.

ARS's Opp'n at 52-53.

ARS points to various instances where Allen expressed strong negative emotions in response to ARS's refusal to construct an addition at its own expense, hire more employees at West Olive, or have its existing employees work OT. For example, at a sometimes "confrontational" meeting during a convention in Chicago in late September 2004, Allen became angry when Zoller and ARS manager Mark Turley pressed him to have Consumers pay for additional OT if it insisted on such a schedule; "got upset" when Turley said it was not financially feasible for ARS to fund the building addition under the current contract, "raising his voice" and "[going] off the deep end."[25]  *See* ARS Opp'n at 7-8 (citing Higginbotham 205 & 210-12, Beard 37 & 63 & 79-80, Allen 58-60 & 64, Zoller 98-100).  Higginbotham recalls that near the end of this meeting, Allen concluded an argument with Turley over the building addition with the statement "Well, if you don't like it, we'll re-bid the contract, period."  Higginbotham 207.  Allen's comment troubled Higginbotham because "when he mentions and kind of threatens about putting the contract up for a bid, it's a concern.  I wouldn't want to terminate any contract . . . .  Or be terminated . . . ."  *Id.* at 218.

The fact remains, however, that when ARS persistently refused to take these measures, Consumers did not withhold any payment or assistance to which ARS was entitled under the contract, nor did it otherwise impede ARS's ability to render *its* performance under the contract.  Significantly for ARS's

---

[25]*See also* ARS Opp'n at 17 (March 14, 2005 meeting ended after Allen became "furious" at Zoller for not agreeing that it would be profitable for ARS to work more OT.  "[O]n that overtime justification letter . . . because I wasn't totally agreeing with him, [Craig] rips it up into shreds and throws it in the wastebasket and huffs and puffs.'") (quoting Zoller 183-84).

theory that Consumers "required" ARS to build the addition etc., Consumers did not even *threaten to* stop

doing anything which the contract required Consumers to do (such as paying the prices for parts and labor

that were set in the contract and the purchase orders).

At most, a reasonable factfinder could find that Allen's statement at the Chicago conference in

September 2004 was an unequivocal threat to terminate the contract and re-bid if ARS did not construct

the building addition.  In other words, at worst Allen threatened[26] to do something which the contract

expressly authorized Consumers to do; no factfinder could find that he threatened to change the terms of

the contract or stop performing while the contract was still in effect.  Like ARS, Consumers had the

contractual right to terminate, on written notice, for any reason or no reason at all.  Therefore, even if

Consumers had carried out Allen's threat to terminate as reprisal for ARS refusing to build the addition,

that would not have been a breach of the contract's express terms.

Nor would carrying out Allen's alleged threat be a breach of the implied duty of good faith and fair

dealing.  A Sixth Circuit panel made this point in *Clark v. West Shore Hosp.,* 16 F. App'x 421, 429-30 (6[th]

Cir. July 31, 2001), which the court finds persuasive.  The defendant-hospital exercised its contractual

right to terminate Dr. Clark's employment on 120 days written notice, and he sued in the Western District

of Michigan for breach of contract, breach of the implied covenant of good faith and fair dealing, tortious

interference with contractual and business relations, and other causes of action.  Then-District Judge

---

[26]

     Other Allen statements about the possibility of ARS exercising its right to terminate the contract and re-bid cannot reasonably be characterized as "threats" at all.  Other statements merely inquire into that possibility of ARS taking that course of action, propose or suggest that ARS take that course of action, or at most, urge and encourage that course of action.  *See, e.g.,* ARS Opp'n at 16 (Allen's testimony and his notes confirm that at the March 14, 2005 meeting or within the two days thereafter, he "mentioned that if ARS wanted to increase the labor rate and add a clause to the Contract to allow time and one half for the overtime they could implement Section 2.b 'Term of Contract' '45 Day Notice to terminate the contract.'"), citing Allen 128.

McKeague had dismissed Clark's complaint for failure to state a claim, and the Sixth Circuit affirmed.

The panel explained,

> the implied covenant of good faith under Michigan law . . . neither overrides nor replaces any express contractual term. *Nor does it require a party to ignore, forego or waive its express contractual rights.* In the present case, it is undisputed that the Hospital complied fully with the 120-day-notice termination provision. To find that the Hospital's utilization of that provision could form the basis for a breach of implied covenant of good faith claim would be tantamount to requiring the Hospital to waive its express contractual rights, in clear contravention of Michigan law.

*Clark v. West Shore Hosp.*, 16 F. App'x 421, 429-30 (6[th] Cir. July 31, 2001)  (citing *Van Arnem Co. v.*

*Mfrs. Hanover Leasing Corp.*, 776 F. Supp. 1220, 1223 (E.D. Mich. 1991)) (emphasis added).

ARS relies on an unpublished Western District of Michigan decision for the proposition that a

party's "improper demand" that the other party do something beyond what is required by the contract, is

itself a breach of contract.  But the decision – the only Michigan-law decision on which ARS relies on this

issue [27]– is readily distinguishable from our case in at least two vital respects.

---

[27]

Consumers also cites two non-Michigan decisions:

*Utah Int'l, Inc. v. Colorado-Ute Elec. Ass'n*, 425 F. Supp. 1093, 1100 (D. Colo. 1976) ("A party to a contract may not unilaterally alter the obligations of any of the parties to that contract.  Defendants, however, have attempted to increase plaintiff's sales obligation under the requirements portion of this contract by altering their business operations in such a manner as to constitute a material breach of that portion of the contract.");

*SMS Data Prods. Group, Inc. v. US*, 17 Ct. Cl. 1, *9 (Ct. Cl. 1989) ("A party which presumes to alter unilaterally a contract is in breach . . . .  The plaintiff argues that HHS unilaterally changed plaintiff's performance obligations.  Therefore according to plaintiff, HHS terminated SMS's for failure to perform adequately an acceptance test which was not part of the contract.  This court agrees with plaintiff.  HHS, rather than SMS, altered the contract and imposed new obligations on the plaintiff.").

ARS's Opp'n at 52-53 n.22.

The court notes that decisions applying the law of jurisdictions other than Michigan, unless adopted or substantively commented upon by Michigan appellate courts, have no bearing on this

In *Chainworks*, Webco was a steel tubing manufacturer-supplier, and Chainworks was a commercial broker of steel tubing which acted as an intermediary between Webco and third-party purchasers.  The two had an ongoing commercial relationship since 1999.  *Chainworks*, 2006 WL 461251 at *1.  In November 2003[28], Webco sent a memorandum to Chainworks regarding pricing for the calendar year 2004.  The memorandum provided price quotations for two types of steel tubing and specified that the prices were "[f]irm for the period 1/1/04 through 12/31/04."  *Id.*  On December 8, 2003, Chainworks issued a blanket PO incorporating the fixed prices stated in Webco's memorandum.  *Id.*  The blanket PO specified that it was a "requirements based blanket order."  The blanket PO also incorporated Webco's published terms and conditions.  *Id.*  The contract thus formed required defendant Webco to supply as much steel tubing (meeting specifications spelled out in the contract) as plaintiff Chainworks requested by PO during 2004, at the prices specified.  *Id.*

---

court's effort to ascertain the law of Michigan.  *Cf. US v. Harvey*, 992 F.2d 324, 1993 WL 152184, *4 (5th Cir. Apr. 26, 1993) ("The cases which Harvey relies on, which involve express restoration of civil rights to felons *under the law of other States*, are not relevant to Harvey's case.  Under Texas law, the only provision . . . .") (emphasis added).

This court is not free to adopt for Michigan whatever legal standards it prefers.  Rather, in anticipating how the Michigan Supreme Court would rule, this court is "bound by controlling decisions of that court", *National Union Fire Ins. Co. of Pittsburgh*, 472 F.3d at 438, or, if the state supreme court has not conclusively decided an issue, "we look to the decisions of the state's intermediate courts unless we are convinced that the state supreme court would decide the issue differently."  *Lancaster*, 501 F.3d at 679 n.3.  As our Circuit has explained, "cases cited from other jurisdictions are irrelevant, because we have no authority in a diversity case such as this to apply anything other than Michigan law, or to alter that law to apply to the facts of the case before us."  *Phillips v. Cabot Medical*, 201 F.3d 441, 1999 WL 1204796, *2 (6th Cir. Dec. 7, 1999).

In any event, this court has assumed *arguendo*, per the non-Michigan decisions cited by ARS, that a unilateral alteration of a material term of a contract can constitute a breach of contract.

[28]
The opinion states "November 2004", but that is obviously a typographical error, given the memorandum's statement that it was setting firm prices "for the period 1/1/04 through 12/31/04."

Right after shipping the first products to Chainworks during the first week of January 2004, Webco mailed an invoice to Chainworks seeking payment at the price quoted in bot h Webco's initial price quotation and Chainworks' blanket PO.  Shortly after sending the invoice,

> Webco notified Chainworks that it was monitoring "dramatic developments in the steel industry" that were creating ". . . higher prices."  These "dramatic developments" eventually . . . caused prices to soar.  As a result . . . Webco's supplier, imposed a . . . surcharge on all steel products and demanded payment by Webco in order to continue the production and shipment of steel.  In response, Webco attempted to pass on the surcharge to Chainworks.  On January 27, 2004, Jeff Williams notified Andy Hinkley that Webco would be assessing a surcharge on steel products shipped to Chainworks effective February 1, 2004.  Webco advised that, "[i]n order to maintain an uninterrupted supply of material to Chainworks; I must have, in writing, your acceptance of these charges."

> Throughout February, Webco sought Chainworks' acceptance of the surcharge, warning, "[i]f Chainworks does not wish to pay the surcharge, we will advise our material supplier that Webco cannot pay the surcharge for Chainworks raw material and we anticipate that they will refuse to ship."

> On March 1, 2004, [Chainworks'] Hinkley sent the following memorandum to [Webco's] Williams:

>> In the interest of maintaining an uninterrupted supply of your products for our customers, we feel that we have no other option but to accept the steel surcharge that you intend to impose on us, as described in your letter dated January 27, 2004. * * *

> Thereafter, Webco sent monthly notices of the surcharge amount to be applied to future shipments.  Between March and August, Chainworks continued to authorize the manufacture and shipment of products to [Chainworks' customer] as needed.

*Chainworks*, 2006 WL 461251 at *1-2 (record citations omitted).

At the end of the year, Chainworks notified Webco that it had found a new supplier and would not continue its relationship with Webco.  *Chainworks*, 2006 WL 461251 at *2.  Upon receipt of the final invoice for 2004, Chainworks deducted all previously-paid surcharges and price increases from its final payment to Webco.  *Id.*  Chainworks brought a diversity action in federal district court, seeking a declaratory judgment that it was not obligated to pay those surcharges and price increases, and Webco

counterclaimed for breach of contract, unjust enrichment, etc.  *Id.*  Chief Judge Bell concluded, "Webco attempted to unilaterally alter the price.  This was a clear breach of contract and Chainworks is not required to pay the additional cost unilaterally required by Webco."  *Id.* at *4.

So far as the record reflects, Consumers Energy's conduct in our case stands in stark contrast to Webco's conduct in *Chainworks* in a substantial and material respect.  Webco expressly threatened to stop performing under the contract, i.e., threatened to stop providing the steel tubes that Chainworks had bargained for even though it was able to provide them, unless Chainworks paid an amount higher than the price specified in the contract.[29]  ARS has not identified any similar communication wherein Consumers threatened to stop paying (or even implied that it would stop paying) if ARS did not construct the addition, hire more employees, or have employees work OT.  ARS complains only that Consumers "insisted" on those measures, with no tangible consequence.  Indeed, when ARS refused to accede to what it characterizes as Consumers' "demands", Allen continued to feud with ARS's officers and repeat the "demands", but Consumers kept the contract in force and continued to pay ARS as the contract required.

Thus, the second and third grounds for ARS's breach-of-contract claim fail.

<u>No Breach of the Implied Covenant of Good Faith and Fair Dealing</u>

Fourth, ARS alleges that Consumers breached the contract by "breaching its duty of good faith and fair dealing through the misuse of its discretion to audit ARS's records and determine when it is entitled to a refund (First Am. Comp., ¶ 113) . . . ."  ARS's Opp'n at 51.  ARS elaborates that

[p]ursuant to § 9 of the ARS-Consumers contract, entitled "Auditing of Accounts,"

---

[29]

 In so doing, Webco not only breached the contract but arguably also violated M.C.L. § 440.2306(2), which provides, "*A lawful agreement* by either the seller or the buyer *for exclusive dealing in the kind of goods concerned imposes*[,] unless otherwise agreed[,] *an obligation by the seller to use best efforts to supply the goods* and by the buyer to use best efforts to promote their sale."  Emphasis added.  That aspect is not present in our case, either.

Consumers, in its sole discretion, had the right to audit ARS's records related to the work under the Contract and to determine whether it was entitled to a refund. There was no appeal right reserved for ARS; the provision does not contemplate any input whatsoever into this process by ARS. [Contract § 9]. In other words, Consumers' performance of its audit right was in its complete discretion. As a result, Consumers had an implied duty to exercise this right in good faith and a fair manner.

*Consumers abused this audit right by requiring that ARS reimburse Consumers for wheel set repairs in excess of the agreed-upon formula.* This is further evidenced by Consumers's subsequent decision to forgive the entire $200,000 alleged overcharge after Craig Allen succeeded in his quest to persuade ARS to terminate the contract.

ARS's Opp'n at 56-57 (paragraph break added, emphasis added).

As ARS concedes, Opp'n at 54, Michigan does not recognize a cause of action for breach of the implied covenant of good faith and fair dealing. *Frame Hardwoods, Inc. v. IN Lumbermen's Mut. Ins. Co.*, 2006 WL 3755287, *4 (Mich. App. Dec. 21, 2006) (quoting *Fodale v. Waste Mgmt. of Mich.*, 718 N.W.2d 827, 841 (Mich. App. 2006) (citing *Belle Isle Grill Corp. v. City of Detroit*, 666 N.W.2d 271, 279-80 (Mich. App. 2003))). *See also Dykema Gossett, PLLC v. Ajluni*, 730 N.W.2d 29, 37 (Mich. App. 2006), *aff'd in part & rev'd in pt o.g.*, 739 N.W.2d 629 (Mich. 2007).

Michigan case law does hold that "'the covenant of good faith and fair dealing is an implied promise in every contract.'" *People v. Vanreyendam*, 2007 WL 1201832, *2 (Mich. App. Apr. 24, 2007) (quoting *Hammond v. United of Oakland, Inc.*, 483 N.W.2d 652, 655 (Mich. App. 2002)), *app. denied*, 738 N.W.2d 730 (Mich. 2007). The covenant is a promise that "neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract." *Hammond*, 483 N.W.2d at 655 (citing, *inter alia*, *Dumas v. Auto. Club Ins. Ass'n*, 473 N.W.2d 652, 665 n.3 (Mich. App. 1991) (Boyle, J., concurring)). A lack of good faith, however, cannot override the express terms of the contract. *Eastway & Blevins Agency v. Citizens Ins. Co. of Am.*, 520 N.W.2d 640, 642 (Mich. App. 1994).

As ARS points out, "[t]his implied covenant limits the parties' conduct when the contract leaves the manner of performance to a party's discretion." *Bero Motors, Inc. v. GMC*, 257675, 2006 WL 2312182, *5 (Mich. App. Aug. 10, 2006) (citing *Ferrell v. Vic Tanny Int'l, Inc.*, 357 N.W.2d 669, 672 (Mich. App. 1984) and *Burkhardt v. City Nat'l Bank of Detroit*, 226 N.W.2d 678, 680 (Mich. App. 1975)), *app. denied*, 743 N.W.2d 886 (Mich. 2008). In other words, "[a] breach of contract may be found where bad faith or unfair dealing exists in the performance of a contractual term when the manner of performance was discretionary." *Liggett Restaurant Group, Inc. v. City of Pontiac*, 2005 WL 3179679, *1 (Mich. App. Nov. 29, 2005).[30][31]

ARS utterly fails to show a genuine issue as to whether Consumers acted in good faith and fairly by auditing its records regarding wheel-set surcharges.[32] ARS does not deny that the contract price of $800 per wheelset already included $115.75 per wheelset that the parties considered to be reimbursement of ARS for its supplier's scrap-metal surcharge. Nor does ARS meaningfully contest Allen's explanation

---

[30]

See, e.g., Sims v. Buena Vista Sch. Dist.*, 360 N.W.2d 211, 213 (Mich. App. 1985) (school district had an implied duty to act in good faith when exercising discretion with respect to providing continued medical insurance to laid-off employees); *GMC v. New A.C. Chevrolet, Inc.*, 263 F.3d 296, 334 n.23 (3d Cir. 2001) (applying MI law) (recognizing that counterclaim was not asserting that plaintiff's bad faith "breached a duty that GM owed to New AC independent of the contractual obligations fixed by the Dealer Agreement . . . . Rather, fairly read, . . . New AC's counterclaim alleges that GM's conduct in approving the DiFeo relocation breached an implied covenant of good faith emanating from the terms of the Dealer Agreement.") (citing *Hubbard* and *Burkhardt*).

[31]

The court disregards ARS's citations to non-Michigan decisions where ARS presents no evidence that the non-Michigan decision was applying Michigan law or has been adopted or favorably commented on by Michigan appellate courts. *See* ARS's Opp'n at 55 n. 23 (citing *Locke v. Warner Bros., Inc.*, 66 Cal. Rptr.2d 921, 925 (Cal. App. 1997)).

[32]

On at least one occasion, defense counsel referred to the $200 surcharges as a "windfall" to ARS. The court intimates no opinion as to whether this characterization is appropriate. Consumers counterclaimed for recovery of the $200 surcharges, let alone under an equitable theory such as unjust enrichment. The court uses the more neutral term "extracontractual" surcharge payments.

that in December 2004, he realized that since January 2003, Consumers had been paying ARS $200 more per wheelset than was required by the contract ($315 instead of $115). Unsurprisingly, Allen apparently then concluded that his January 2003 commitment to have Consumers pay the extra $200 per wheelset was mistaken and ill-advised. For purposes of ARS's breach-of-contract claim, it is immaterial whether ARS agrees with Allen's opinion on that issue.

The material question is only whether Consumers acted in good faith and fairness when it decided that an audit was warranted to confirm the existence of extracontractual surcharge payments and, if they existed, to ascertain their extent. No reasonable factfinder could conclude that Allen's suspicion (that Consumers had been paying extracontractual surcharges) was fabricated or that it was objectively unreasonable. Nothing in the record suggests that Consumers conducted unduly frequent or unnecessarily burdensome special audits, as might be consistent with the notion that Consumers used audits as a means of harassing ARS personnel to impede their ability to perform under the contract (or simply harass them enough that ARS decided to terminate the contract). On the contrary, ARS points to the lone special audit, which investigated only wheel-set surcharges.

Thus, no reasonable factfinder could find that Consumers acted in bad faith or unfairly when it decided to exercise its contractual right to conduct a single audit in order to confirm the existence and extent of the extracontractual payments. *Cf. generally English Gardens Condo., LLC v. Howell Twp.*, 729 N.W.2d 242, 247 (Mich. App. 2006) (the "principle [of good faith and fair dealing] does not restrict defendants from acting on the basis of reasonable beliefs that plaintiff had failed to fulfill its obligations."), *aff'd in pt and rev'd in pt o.g.*, 741 N.W.2d 511 (Mich. 2007)[33]; *cf. Kenwood Lincoln-Mercury, Inc. v.*

---

[33]

When Consumers conducted the audit, it confirmed Allen's suspicion that from January 2003 through December 2004, Consumers had paid $200 more per wheelset than required by the contract. Although ARS persists in referring to "alleged" overcharges, *see* Opp'n at 57, it fails to identify any

-71-

*Daimlerchrysler Corp.*, 2002 WL 10073 (Ohio App. 1st Dist. Jan. 4, 2002) (car manufacturer did not violate its duty of good faith and fair dealing when it conducted audit of dealership's warranty claims; manufacturer had contractual right to audit such claims, and agreement was entered into freely by parties possessing equal experience and bargaining power).

Thus, the fourth ground for ARS's breach-of-contract claim also fails.

<u>Michigan's Doctrine of Repudiation and Anticipatory Breach Does Not Apply</u>

ARS concludes its opposition brief by asserting, without elaboration, "ARS terminated the contract only after Consumers breached the contract." ARS's Opp'n at 54. In the decision on which ARS relies, *Chainworks*, *supra*, Chief Judge Bell reasoned that "Webco unilaterally imposed the price increase and forced Chainworks to accept it under the threat of repudiating the contract." 2006 WL 461251 at *8. ARS does not use the term "repudiation," but the court notes that ARS has not shown any genuine issue as to Consumers repudiating the contract before ARS terminated.

"Under the doctrine of repudiation or anticipatory breach, if, before the time of performance, a party to a contract unequivocally declares the intent not to perform, the innocent party has the option either to sue immediately for the breach of contract or wait until the time of performance." *Skladanowski v. Clear Channel Radio*, 2006 WL 3682184, *1 (Mich. App. Dec. 14, 2006) (citing *Stoddard v. Mfrs. Nat'l Bank of Grand Rapids*, 593 N.W.2d 630, 640 (Mich. App. 1999)). In determining whether repudiation occurred, it is the party's intention manifested by acts and words that is controlling, not any secret intention. *Stoddard*, 593 N.W.2d at 640 (citing *Paul v. Bogle*, 484 N.W.2d 728, 735 (Mich. App. 1992)). As the Michigan Court of Appeals has explained,

---

contractual provision that it believes required Consumers to pay the additional $200. Accordingly, no reasonable factfinder could find that Consumers acted in bad faith or unfairly when it asked ARS to refund the approximately $200,000 in extracontractual payments that were uncovered by the audit.

> Regarding oral repudiation, "a party's language must be sufficiently positive to be reasonably interpreted to mean that the party will not or cannot perform"; regarding repudiation by acts, "a party's act must be both voluntary and affirmative, and must make it actually or apparently impossible for him to perform."

*Paul*, 484 N.W.2d at 735-36 (quoting 2 RESTATEMENT OF CONTRACTS 2D § 250). ARS has not alleged

any acts or statements by Consumers that a reasonable factfinder could find satisfied this standard.

*Contrast Mann & Parker Co. v. Wel-Dri*, 579 F.2d 973, 976 (6th Cir. 1978) ("[A]s found by the District

Court, defendant 'deliberately repudiated the contract by advising the plaintiff that defendant could not

live with the performance guarantee as written and *did not intend to go forward* on the basis of the signed

proposals to supply equipment and installation under any such guarantee.'") (emphasis added). There is

no merit to any suggestion that Consumers repudiated the contract and thereby justified an anticipatory

breach by ARS.


# Intentional Misrepresentation / Fraud

### (Count 2 - Against Beard and Allen Only)

In Count Two, ARS asserts a claim for intentional misrepresentation / fraud against former ARS

employee Beard and Consumers senior engineer Allen. Count Two identifies two alleged intentional

misrepresentations by Allen and three alleged intentional misrepresentations by Beard.

<u>Michigan Common Law on Intentional Misrepresentation</u>

In Michigan, the elements of the common-law tort of intentional misrepresentation are: (1) the

defendant made a material misrepresentation; (2) it was false; (3) when he made the representation, he

knew that it was false; (4) he made the representation with the intention that the plaintiff should act on it;

(5) the plaintiff did in fact act in reliance on it; and (6) the plaintiff thereby suffered injury or damage. *Hi-*

*Way Motor Co. v. Int'l Harvester Co.*, 247 N.W.2d 813, 816 (Mich. 1976) (citing *Candler v. Heigho*, 175 N.W. 141, 143 (Mich. 1919)).  *See also Adams v. Charter Twp. of Orion*, 2008 WL 466891, *4 (Mich. App. Feb. 21, 2008) (stating the elements of fraudulent misrepresentation) (citing, *inter alia*, *Campbell v. Sullins*, 667 N.W.2d 887 (Mich. App. 2003)).

To be actionable as misrepresentation, a statement must relate to a past fact or an existing fact.  *Hi-Way*, 247 N.W.2d at 816 (citing *Boston Piano & Music Co. v. Pontiac Clothing Co.*, 165 N.W. 856 (Mich. 1917)).  There is an exception:  if a promise of future conduct is made "in bad faith without the intention to perform," then the promise can form the basis for a fraudulent-misrepresentation claim.  *Id.* (citing *Crowley v. Langdon*, 86 N.W. 391 (Mich. 1901)).  However, to come within this exception, evidence of fraudulent intent "must relate to conduct of the actor 'at the very time of making the representations, or almost immediately thereafter.'" *Id.* at 817 (quoting *Danto v. Charles C. Robbins, Inc.*, 230 N.W. 188, 190 (Mich. 1930)).

There is a second exception to the rule that a statement cannot form the basis for a fraudulent-misrepresentation claim unless it relates to an existing or past fact.  The so-called "false token" exception applies when "although no proof of the promisor's intent exists, the facts of the case compel the inference that the promise was but a devise to perpetrate a fraud."  *Hi-Way*, 247 N.W.2d at 817 (citing *Rutan v. Straehly*, 286 N.W. 639 (Mich. 1939)).  *See, e.g., Wilson v. Kiss*, 751 F. Supp. 1249, 1255-56 (E.D. Mich. 1990) (denying motion to dismiss claim that employee was induced to join company by "strong declarative statements regarding the tangible benefits" of joining the company – i.e., that plaintiff would enjoy significant responsibility and earn large salaries and commissions – which did not contain phrases such as "I think" or "I believe") (although statements were essentially promises to render future performance, they were actionable  because the employer made the statements in bad faith with no present intention to

-74-

perform).

### Plaintiffs May Use Circumstantial Evidence, But Burden of Proof is Clear and Convincing.

Fraud can be established by circumstantial evidence. *Stout v. Withrow*, 2008 WL 400695, *5 (Mich. App. Feb. 14, 2008) (citing *Foodland Distributors v. Al-Naimi*, 559 N.W.2d 379, 384 (Mich. App. 1996) (citing *Goldberg v. Goldberg*, 295 N.W.2d 194, 196 (Mich. 1940))). However, Michigan requires that fraud be proven by clear and convincing evidence, not merely a preponderance of the evidence. *Hi-Way*, 247 N.W.2d at 816 (citing *Youngs v. Tuttle Hill Corp.*, 128 N.W.2d 472 (Mich. 1964)). Therefore, to survive summary judgment, ARS must show a genuine issue as to whether it could prove fraudulent misrepresentation *by clear and convincing evidence*.

### Reliance on the Statement Must Be Reasonable, and Plaintiffs Have a Duty to Investigate.

In addition, the reliance must be reasonable. *Aero-Taxi Rockford v. GMC*, 2006 WL 1479915, *15 (Mich. App. May 30, 2006) (citing *Nieves v. Bell Indus., Inc.*, 517 N.W.2d 235, 238 (Mich. App. 1994)). That means a misrepresentation is not actionable as fraud where the plaintiff knew or reasonably should have known[34] the statement was false. *McIntyre v. Lyon*, 37 N.W.2d 903, 906 (Mich. 1949) ("Knowledge of the falsity of representations is inconsistent with reliance thereon.") (citing *Candler v. Heigho*, 175 N.W. 141, 143-44 (Mich. 1919)); *Nieves*, 517 N.W.2d at 238 ("[T]here can be no fraud where a person has the means to determine that a representation is not true.") (citing *Montgomery Ward & Co. v. Williams*, 47 N.W.2d 607, 611 (Mich. 1951))).

---

[34] *See, e.g., Brodsky v. Sanom*, 1999 WL 33435461, *2 (Mich. App. Sept. 24, 1999) ("Even assuming that defendant's statement that Emerald Construction failed to file annual reports . . . was a material misrepresentation that defendant knew was false when he made it, there is no indication that plaintiff acted in reliance . . . . Plaintiff, as president and sole shareholder of the corporation, had access to knowledge regarding whether the annual reports were filed and thus would have known that any misrepresentation by defendant regarding the annual reports was false.").

For example, as a matter of law it is not reasonable to rely on an oral statement that contradicts a written provision in a contract that does not permit oral modification.  *See Novak v. Nationwide Mut. Ins. Co.*, 599 N.W.2d 546, 553 (Mich. App. 1999) ("[T]he written contract, with its integration clause, expressly contradicted statements 4 and 5, making plaintiff's alleged reliance on these statements unreasonable.") (citing *Nieves*, 51 N.W.2d at 237-39 ("[P]laintiff acknowledged that he read the at-will employment language in the various documents . . . and that Lerner could not alter the terms . . . .  He chose to believe Lerner rather than the signed contract.  H[e] cannot claim to have been defrauded where he had information available to him that he chose to ignore.")).

Finally, before relying on a statement, "parties must use ordinary caution and make a reasonable investigation before they can be considered to have justifiably relied on the opposing party's misrepresentation."  *Mobil Oil Corp. v. Presto Oil Co.*, 178 F.3d 1295, 1999 WL 97253, *4 (6[th] Cir. Feb. 17, 1999) (citing *Schepke v. DNR*, 464 N.W.2d 713, 715 (Mich. App. 1990) and *Commerce Acceptance Co. v. Denton*, 98 N.W.2d 633, 635 (Mich. 1959)).

ARS describes Allen's first alleged misrepresentation as follows:

76.  *Mr. Allen represented to Appalachian Railcar that Appalachian Railcar had overcharged Consumers by $200,000 for wheel set repairs,* and he used this alleged overcharge as a ploy to get Appalachian Railcar to terminate the ARS-Consumers Contract and rebid the contract.  Mr. Allen knew this representation was false.  Consumers later recognized the overcharge as a mistake and forgave the overcharge.

77.  At the time he made this representation regarding the alleged overcharges, Mr. Allen intended for Appalachian Railcar to rely on this representation to its detriment by terminating and rebidding the contract, as it did.

78.  At the time he made this representation, Mr. Allen also knew that Mr. Beard and he would work toward ensuring that the Consumers contract would be awarded to Boatright or a company controlled by Boatright.

Am. Comp. ¶¶ 76-78 (emphasis added).

First, ARS has shown no genuine issue as to the accuracy of Allen's statement that ARS overcharged Consumers by $200,000 for wheel-sets and owed a refund.  ARS continually says it "did not think [the refund request] was legitimate", but it does not substantiate this opinion.  As noted below in the discussion of ARS's breach-of-contract claim, ARS has not identified any provision in the contract that it believes required Consumers to pay another $200 per wheel-set – in addition to the $115.75 per wheelset that was already built into the price calculated pursuant to the cost-plus-15% formula required by the contract subsection entitled "Contract Price - Materials."  *See* ARS Opp'n, Ex. 15 (Contract) § 3(b).  Nor has ARS argued that Allen was authorized to modify, and did effect a valid modification of the contract's wheelset price term.  The court finds that ARS has not shown a genuine issue as to whether Allen's statement regarding $200,000 in extracontractual wheelset charges was false, let alone that Allen knew it was false when he said it.

Second, even if ARS had shown a genuine issue as to whether Allen's statement about the $200,000 in extracontractual surcharge payments was false and that Allen knew it when he said it, ARS has not shown a genuine issue as to whether it *relied* on that statement when it decided to terminate the contract.  ARS cannot disavow or explain away the straightforward testimony of its Chief Executive Officer, Higginbotham, that *the* reason that ARS terminated the contract was to re-bid and obtain a higher labor rate.  "A party may not create an issue of fact by asserting contrary facts after giving damaging deposition testimony."  *Shaffer v. St. Joseph's Mercy Hosps. of Macomb*, 2007 WL 4555333, *4 (Mich. App. Dec. 27, 2007) (citing *Dykes v. Wm. Beaumont Hosp.*, 633 N.W.2d 440, 445 (Mich. App. 2001)).  "'If a party who has been examined at length on deposition could raise an issue of fact simply by submitting an affidavit contradicting his own prior testimony, this would greatly diminish the utility of summary judgment as a procedure for screening out sham issues of fact.'" *Shaffer*, 200 7WL 4555333 at

-77-

*4 (quoting *Dykes*, 633 N.W.2d at 445 (citation to 2d Cir. decision omitted)). Higginbotham's testimony

precludes the notion that Allen's statement about wheelset surcharges caused or motivated ARS to

terminate the contract:

> Q.   Well, then tell me why did you terminate the contract?
>             * * *
> A.   Whenever we had, when Craig [Allen] asked us to increase our rate, we had to re-bid the contract.
> Q.   What do you mean you had to re-bid the contract?
> A.   He had [sic] to rebid the contract if we wanted to increase our labor rate.
>             * * *
> Q.   And so you terminated the contract?
> A.   He asked and asked[,] several occasions myself and our other employees to re-bid the contract, and the only way that we could increase our labor rate was to re-bid the contract.  And when I agreed yes, at some point [Vice-President] John Zoller had sent him an email that we would terminate the contract on or 45-day clause.  And at that point, I don't know what day it was, I went to visit Craig [Allen] at West Olive March the 24[th] or 25[th] and that's where I signed the agreement to re-bid the contract.
>             * * *
> Q.   *And the reason you terminated the contract is because you wanted to increase the labor rate, correct?*
>             * * *
> A.   *Yes.*

Higginbotham 242:23 to 244:13 (objections by plaintiff's counsel omitted, emphasis added).

First, Higginbotham did not say that increasing the labor rate was "just one of several reasons" why

ARS terminated; he agreed that it was "*the*" reason.  Second, Higginbotham agreed that he had "no

evidence" to "support the notion that the claim of an overcharge was a ploy to bait Appalachian Railcar

into terminating and then re-bidding . . . ."  Higginbotham 281:18-25.

Third, even assuming that ARS relied on Allen's statement (that ARS "had overcharged

Consumers by $200,000 for wheel set repairs") in deciding to terminate, it has not shown a genuine issue

as to whether such reliance was reasonable.  ARS alleges that "the claim of an overcharge was a ploy to

bait Appalachian Railcar into terminating and then rebidding . . . .  This conclusion is supported by the fact

-78-

that the alleged overcharge was later recognized by Consumers as a mistake and was forgiven." Am. Comp. ¶ 45. It is true that Michigan permits intentional misrepresentation to be proven by circumstantial evidence, so the circumstantial nature of the fact that Consumers dropped its demand for a wheelset refund is not fatal. But even supposing that the whole wheelset dispute, including Allen's statements, was a ploy, ARS does not explain how Allen's wheelset-surcharge statement could have possibly led it to believe that it should terminate the contract.

It might have made sense for ARS to terminate and re-bid if (1) the contractual wheelset price was insufficient to cover the surcharge that ARS was paying its supplier and (2) Consumers gave ARS some reason to believe that it could win a new contract that allowed a higher wheelset price. But ARS has never alleged that the contractual wheelset price was insufficient to reimburse it for the surcharge it paid to the supplier; specifically, it has never alleged that its supplier was charging it more than the $115.75 that was already reflected in the contractual price of $800 per wheelset. Nor has ARS alleged that Consumers gave it any reason to believe that it could win a new contract that allowed a higher wheelset price. On the contrary, the parties agree that Consumers was unwilling to pay more than the $115.75 surcharge per wheelset that was reflected in the existing price. Moreover, Higginbotham testified that he hoped to achieve a higher labor rate in the new contract; neither Higginbotham nor anyone else at ARS testified that it hoped to achieve a higher wheelset rate, or a higher parts rate generally.[35] In short, if ARS relied on

---

[35]

The complaint implies that *Allen* implied that a higher-labor-rate contract would generate enough additional profit for ARS to defray the cost of honoring his "demand" for a refund of extracontractual wheelset charges, among other "demands":

> In February or March of 2005, Mr. Allen had . . . conversations with ARS executive personnel, in which he . . . pressed for the building addition and additional overtime work, and insisted Consumers had been overcharged for wheel set repairs. He repeatedly suggested that ARS should rebid the contract in order for Consumers to be able to pay it a higher labor rate which could enable ARS to pay for his demands.

Allen's statement about $200,000 in wheelset overcharges in deciding to terminate, that reliance was unreasonable.

Accordingly, Allen's alleged misrepresentation about wheel-set overcharges cannot form the basis for a fraudulent-misrepresentation claim under Michigan common law.

ARS's describes Allen's second alleged misrepresentation as follows:

79.    *Mr. Allen also represented to ARS that he did not know or could not recall the identity of the purported fifth bidder (Boatright) engaged in the bidding process for the Consumers contract.* Mr. Allen knew this representation was false because he also knew that Boatright . . . planned to bid on the contract.

80.    Mr. Allen made this representation to Appalachian Railcar because he knew that Appalachian Railcar would recognize his scheme, as defendant Beard had many times represented to ARS management that he was close friends with Shane Boatright, because Boatright had no prior railcar repair shop experience, and because Mr. Allen had previously expressed to ARS that i[t] needed to "take care of Matt [Beard]" and should have promoted him into higher positions of responsibility.

Am. Comp. ¶¶ 79-80 (emphasis added).  According to Higginbotham, however, Allen made this statement to ARS in late March or early April 2005, *after* ARS terminated (March 25, 2005).  Higginbotham testified as follows:

Q.    Now you knew that Consumers was going to send out their R.F.P. [Request For Proposal] to other companies, too, correct?
A.    Craig [Allen] had told me that he was going to send some more out, yes.

Q.    Did he tell you who?
A.    All of them but one company he told me, yes.
Q.    What did he tell you?
A.    He was sending the R.F.P. to Progress Rail, Transco, Mellinium [sic], ourselves. And the other one he couldn't remember.

Q.    *When was that that he told you that?*
A.    It was I think during our meeting in March or sometime late March.

_____

Am. Comp. ¶ 35.  The briefs, however, do not seem to provide citations to any deposition transcript or affidavit to substantiate this assertion.

-80-

Q.     Okay.

A.     *Late March, first of April.*

Higginbotham 248:15 to 249:4 (emphasis added).

Because Allen made this allegedly false statement *after* ARS terminated the contract, ARS could

not have relied on that statement when it decided to terminate the contract.  *See Novak v. Nationwide Mut.*

*Ins. Co.*, 599 N.W.2d 546, 553 (Mich. App. 1999) ("[R]egarding statement 1 above, that plaintiff would

immediately begin to receive commissions on the renewals of policies that had been serviced by his father,

plaintiff testified that the allegedly false information defendants gave him about commissions occurred

*after* he signed the contract; thus, he could not have relied on the information in signing the contract.");

*Popielarski v. Jacobson*, 59 N.W.2d 45, 52 (Mich. 1953) (reversing misrepresentation judgment against

defendants named Schreiber, Supreme Court reasoned, "The Schreibers had absolutely nothing to do with

the . . . contract . . . made between plaintiffs and Jacobson on January 9, 1950. [O]ne of them never saw

plaintiffs prior to . . . trial . . . and the other first saw them after the contract . . . had been executed . . . .

Plaintiffs, therefore, could not have relied on any statement thereafter made by Nathan Schreiber.").[36]

Accordingly, Allen's statement that he did not recall the identity of the fifth RFP invitee

---

[36]

*Cf. Callihan v. Talkowski*, 124 N.W.2d 788 (Mich. 1963) (vacating judgment in favor of
defendant-seller and remanding for new consideration of fraudulent-misrepresentation claim):

> Plaintiffs . . . alleged fraud predicated on defendant's misrepresentation of gross sales
> of a bar and food business known as Cut River Inn.  They further alleged they had
> read 2 advertisements in the Detroit News offering the place for sale, the first of
> which read in material part as follows: "Gross sales $29,000 in 8 months." * * *
> Defendants answered . . . that the plaintiffs were informed the Cut River Inn was
> for sale and visited the premises before the newspaper advertisements appeared and,
> therefore, could not have relied upon the advertisements.

*Id.* at 789.

(Boatright) cannot form the basis for a fraudulent-misrepresentation claim in Michigan.[37]

ARS describes Beard's first alleged intentional misrepresentation as follows:

81.    *Mr. Beard represented to [ARS] that it should rebid the contract with Consumers,* while knowing that he planned to, and . . . had begun to assist [ARS]'s competitor to obtain the contract using [ARS]'s proprietary information to undercut [ARS]'s bid.

82.    At the time Mr. Beard made this misrepresentation, Mr. Beard knew he would work toward ensuring that the Consumers contract would in fact be awarded to Boatright or a company controlled by Boatright.

83.    At the time Mr. Beard made this representation, Mr. Beard knew that Appalachian Railcar would rely upon it to its detriment, as it did.

An. Comp. ¶¶ 81-83 (emphasis added).

First, the complaint does not specify *when* Beard made this statement, so the court cannot be sure that ARS could have relied on the statement in deciding to terminate the contract. (And Higginbotham, at least, testified that he did not speak with Beard about terminating the contract before he actually terminated it. *See* Higginbotham 248:10-12.

Second, Beard's alleged representation that ARS "should rebid the contract with Consumers" is a statement of opinion, not a statement of fact. As such, as a matter of law it cannot form the basis for a misrepresentation claim under Michigan common law. *See City Nat'l Bank of Detroit v. Rodgers & Morgenstein*, 399 N.W.2d 505, 507 (Mich. App. 1986) ("The trial court . . . reasoned that the misinterpretation must be based upon a material misrepresentation of fact and not upon an opinion. We

---

[37]    ARS notes in passing that "[d]uring the time that ARS was preparing its bid in [late] March or early April 2005," Allen told Higginbotham that he would "'hope and like' for ARS to be awarded the Consumers contract." ARS's Opp'n at 22, quoting Higginbotham 247-51. ARS's complaint did not identify this statement as an alleged actionable misrepresentation. In any event, ARS terminated the contract on March 25, 2005, so any statement by Allen after ARS terminated could not form the basis for a misrepresentation claim as to the allegedly wrongfully-induced termination.

agree."); *cf. Krieger v. Gast*, 2000 WL 288442, *15 (W.D. Mich. Jan. 21, 2000) (Quist, J.) ("The court also finds that the statements set forth in paragraphs 44 and 45 of the complaint do not constitute misrepresentations of fact because those statements reflect opinions or described events which were 'anticipated to occur after the Merger' . . . .").

There is ancient Michigan Supreme Court authority that at first blush might seem to recognize an exception to the rule that statements of opinion are not actionable as misrepresentation. On closer examination, however, these authorities do not stand for such a proposition. In addition, these authorities arose in the context of the sale of real or personal property, not a commercial contract for services or a competition to obtain such a contract (such as the Consumers re-bid).

*Picard v. McCormick*, 11 Mich. 68, 1862 WL 1130, *3 (Mich. 1862) held that where a party selling jewelry intentionally misrepresented its value, the misrepresentation would not be considered a mere statement of opinion or "trade talk," because both parties considered value to be the contract's essential element and the seller had special knowledge not possessed by the buyer.

The Supreme Court cited *Picard* on this score in three decisions, all issued over a century ago. Like *Picard*, all were in the context of a speaker who had special knowledge about the value of an item of real or personal property and intentionally misrepresented its value to someone who relied on that statement in deciding to buy. Moreover, the Supreme Court considered the misrepresentations regarding value to be statements of *fact*, not opinion, thus distinguishing it from Beard's first alleged misrepresentation. *See Coulter v. Minion*, 102 N.W. 660, 661 (Mich. 1905) (defendant exchanged a farm for residential property and was to receive $250 difference in cash; defendant misrepresented to plaintiff that the farm was valuable, when in fact he knew it was not, as shown by the fact that plaintiff soon abandoned it); *Maxted v. Fowler*, 53 N.W. 921, 921 (Mich. 1892) (misrepresentation that stock was readily

selling at a dollar per share was actionable) ("Where the defendant knows that the plaintiff is wholly ignorant of the value of the property, and knows that he is relying on the defendant's representation, *and such representation does not take the form of a mere expression of opinion*, and is in the nature of a statement of fact, the rule of *caveat emptor* does not necessarily apply."); *Kost v. Bender* 25 Mich. 515, 515-17, 1872 WL 3246 (Mich. Oct. 15, 1872) (speaker professed to have "peculiar scientific knowledge, which enabled him to express reliable opinions as to the probability of the lands proving valuable for the production of oil . . . .").

At least two other Supreme Court decisions announced a similar rule treating intentional misrepresentations regarding value as actionable statements of fact rather than non-actionable statements of opinion, but the rule was phrased so as to be confined to the sale of *land*. Moreover, the Court made clear that the claim warranted submission to the jury only because, under the circumstances, it was *not* treated as a mere statement of opinion. *See Nowlin v. Snow*, 40 Mich. 699, 1879 WL 3105, *2 (Mich. 1879); *Hokanson v. Oatman*, 131 N.W. 111, 113 (Mich. 1911) (land purchaser could maintain misrepresentation action against broker, who, being authorized to sell for $900, told purchaser he had convinced the owner to reduce the price from $2,000 to $1,500 and that it was a bargain) ("*The representations by defendant were not mere statements of opinion* as to the value of the property, but were statements of facts within his own knowledge and unknown to plaintiff, which were intended to, and did, influence him in making the purchase, and on which he had the right to rely.") (emphasis added).

Although the modern cases do not usually cite these authorities, they follow the same rule. *See Foreman v. Foreman*, 701 N.W.2d 167, 175 (Mich. App. 2005) ("Representations by an individual who has personal knowledge of the value or condition of land or property cannot be construed as a mere expression of opinion, but rather constitute a statement of fact.") (citing *Groening v. Opsata*, 34 N.W.2d

560 (Mich. 1948)), *app. denied*, 714 N.W.2d 288 (Mich. 2006).

Accordingly, the decisions governing a knowledgeable or expert seller's false statements about property value or condition do not change the result: Beard's first alleged misrepresentation cannot serve as the basis for a misrepresentation claim because it was a statement of opinion (ARS "should rebid the contract with Consumers"), not a statement of fact.

ARS describes Beard's second alleged intentional misrepresentation as follows:

84.   *Mr. Beard also represented that he did not know the identity of the purported fifth bidder (Boatright) engaged in the bidding process for the Consumers contract.* At the time Mr. Beard made this representation, Mr. Beard was actually working in concert with Shane Boatright and Boatright Enterprises to ensure that the bid of Boatright . . . would be accepted by Consumers, and had already committed to work for Boatright Enterprises as the facility manager.

Am. Comp. ¶ 84. ARS's opposition brief does not show how such a statement could satisfy the elements for intentional misrepresentation under Michigan common law. *See* ARS's Opp'n at 43-45.

Indeed, if Beard's statement addressed the identity of the companies who were "engaged in the bidding process for the Consumers contract," the statement was necessarily made after ARS terminated. Consequently, it was impossible for ARS to rely on this statement in deciding to terminate. *See, e.g., Wilson v. Continental Dev. Co.*, 112 F. Supp.2d 648, 661 (W.D. Mich. 1999) (Bell, C.J.) ("Plaintiff cannot possibly prove that he was induced to part with his interest in the patent in May of 1991 by misrepresentations made by defendants one year later."), *aff'd o.b.*, 234 F.3d 1271, 2000 WL 1679477 (6[th] Cir. Nov. 2, 2000); *St. Paul Fire & Marine Ins. Co. v. CEI Florida, Inc.*, 854 F. Supp.2d 656, 667 (E.D. Mich. 1994) ("Ferguson accepted St. Paul's offer of coverage on or about December 1 . . . . * * * Coverage was effective that same day. * * * Therefore, defendants could not have relied upon the alleged misrepresentations . . . on December 5, 1999, in making a contract because the contract was already in effect before the meeting started.").

-85-

Accordingly, Beard's second statement cannot form the basis for an intentional-misrepresentation claim.

<u>ARS describes Beard's third alleged intentional misrepresentation as follows:</u>

85.    *Mr. Beard represented to [ARS] that its bid price was adequate to secure the Consumers contract.* Mr. Beard knew this representation was false because he also knew what Boatright . . . planned to bid for the contract. Mr. Beard made this representation to [ARS] because he knew that [ARS] would rely upon it to its detriment, as it did.

Am. Comp. ¶ 85 (emphasis added). ARS points to testimony by its Higginbotham and VP Zoller that Beard suggested how much to bid, and that Higginbotham, the decisionmaker, relied on Beard's suggestion. Discussing ARS's bid in response to the March 2005 RFP, Higginbotham testified:

Q.    Who helped prepare this document?
A.    John Zoller, Pixie Legg.

Q.    Anybody else have anything to do with putting together the information in this document?
A.    Pricing came from Matthew Beard on the labor rate.

Q.    Tell me about that.
A.    The labor rate we came up with when I visited the West Olive shop in early April of '05, and Matt picked me up at the airport.
* * *
A.    [A]fter our [Higginbotham and Allen's] meeting and dinner that night on our way back, you know, I talked to Matt and asked him if we did not get the Consumer contract what his plans were to, to do. And he specifically told me he would come to work for A.R.S. at another location.
* * *
A.    * * * And then we were talking about the labor rate, and I asked him what he thought the rate should be on our re-bid, and he specifically told me between $38 and $39 an hour was the previous bid from 2002 that Craig [Allen] had told him the Consumer rate was quoted to him from Transco and Progress Rail *and he felt that was a safe rate to quote*.

Q.    Transco and Progress Rail had bid $38 to $39 an hour in 2002?
A.    Yes.
Q.    And Matt [Beard] told you that Craig Allen had told him that. Correct?
A.    Yes.

-86-

> Q.    And what was going on there is that he [Beard] was then conveying that information to you?
>
> A.    Yes.
>
> Q.    Okay.  Do you know why Mr. Allen was telling Mr. Beard that?
>
> A.    I have no idea.
>
> Q.    Were you concerned at all about using that information?
>
> A.    I was pretty [much] relying on Matt.

Higginbotham 249:18 to 251:22 (emphasis added).

For two independent reasons, Beard's alleged assurance that $38-39 was a "safe" labor rate to win the re-bid cannot support a claim for intentional misrepresentation under Michigan common law: ARS has not satisfied the statement-of-fact element or the reasonable-reliance element.

Beard's statement that Allen told him that two of ARS's competitors had bid $38-39 per hour in 2002, was a statement of fact.  But Beard's assurance that "he felt that was a safe rate to quote" was a statement of opinion.  As such, it is not actionable as intentional misrepresentation.  *See City Nat'l Bank*, 399 N.W.2d at 507 ("The trial court . . . reasoned that the misinterpretation must be based upon a material misrepresentation of fact and not upon an opinion.  We agree.").

Even if Beard's statement about a "safe" labor rate was a statement of fact rather than opinion, it was unreasonable for ARS to rely on the statement in formulating its labor rate on the re-bid.  ARS emphasizes that when Beard allegedly said that its bid was adequate, it knew that Allen thought highly of Beard and his work and that the two men had a good relationship.  ARS expected Beard would use his relationship with Allen to ensure that ARS won the re-bid.  *See* ARS's Opp'n at 44 ("it is fair to infer from the testimony [of Higginbotham and Zoller] that part of the reason they believed they would win the re-bid was because of their understanding that 'Craig [Allen] loved Matt.'  They knew that Mr. Allen valued Mr. Beard tremendously, and they believed that Mr. Beard was acting to help ARS in connection with the re-

-87-

bid . . . .").

The fact remains, however, that when Beard assured ARS that its re-bid price was adequate, he was an ARS employee. There is no allegation that Beard had authority, formal or informal, to bind Consumers in its selection of a new contractor. Even assuming that Beard had a close relationship and stellar reputation with Allen, ARS had no solid basis for believing that Beard could help decide for Consumers what bid terms and rates would best suit its budget and needs. (ARS's CEO acknowledged that he knew that not even Allen, who unlike Beard was a Consumers supervisory official, had the authority to ensure that ARS would win the re-bid. *See* Higginbotham at 314:15-23.)[38] For this reason alone, it might be hard for a reasonable factfinder to find it reasonable for ARS to rely so heavily on Beard's assurance in formulating its bid price. *Cf. Various Markets, Inc. v. Yearn*, 2001 WL 651235, *3 (Mich. App. May 22, 2001) ("Since only DuPuis or his father could actually bind Plaintiff to an exclusivity agreement with Tangent, even if Yearn made any representations to the contrary, plaintiff could not have relied on any such agreement knowing that Yarn could not execute such an agreement. Consequently, plaintiff failed to present any evidence that it relied on any alleged misrepresentations made by Yearn.").

But there is a clearer factor which shows that any reliance on the labor rate suggested by Beard was not reasonable: Higginbotham himself admitted that he had doubts about whether the information about ARS's potential competitors' bids was accurate but used the information anyway, making no attempt to corroborate it. Higginbotham testified as follows:

---

[38] ARS submits testimony from Allen's boss, Gallaway, that he did not review the rebids. Rather, Gallaway merely reviewed bid summaries, focused primarily on price, and relied heavily on Allen's advice when deciding which company would win the new contract. *See* ARS Sur-Reply at 6 and Ex A (Gallaway Dep) 79 to 80; *see also* Consumers Feb. 8, 2008 Filing, Ex E (Gallaway Dep) 14:4 to 15:5. But the material question is not whether Allen had the *de facto* influence to ensure that Boatright won the re-bid, but whether ARS *knew* or had reason to believe that Allen had such influence. ARS presents no evidence on that latter point.

Q.    Is that ethical, Mr. Higginbotham, to use that information from other people's bids?

A.    I wasn't sure if it was from another person's bid.

Q.    You thought it was; otherwise you wouldn't have used it, right?

* * *

A.    The reason we quoted at that price was the increase for the overtime and the building [-] to cover those costs.

Q.    Sure.  But you wanted a safe rate that you thought would get you the bid and you were relying on in your mind what you thought were actual labor rates charged by other builders in 2002 to Consumers, correct?

* * *

A.    From what Matt told me, yes.

Q.    [D]id you have any ethical concerns about using that information?

A.    I was concerned how he actually got it, yes.

Q.    Did you ever ask Mr. Allen about that?

A.    No.

Q.    So you had doubts about whether or not that was accurate information?

A.    Yes.

Q.    But you used it anyway?

A.    Yes.

Higginbotham 251:23 to 253:1.  By ignoring his own doubts and relying on Beard's assurance anyway, he failed to comply with the rule that "parties must use ordinary caution and make a reasonable investigation before they can be considered to have justifiably relied on the . . . misrepresentation." *Mobil Oil*, 1999 WL 97253 at *4 (citing *Schepke v. DNR*, 464 N.W.2d 713, 715 (Mich. App. 1990) and *Commerce Acceptance Co. v. Denton*, 98 N.W.2d 633, 635 (Mich. 1959)).

For these reasons, the court will grant summary judgment to Beard as to his alleged misrepresentation about a "safe" labor rate.[39]

---

[39]    In any event, as discussed above, the amended complaint's prayer for relief seeks damages "sustained as a result of *the* lost contract", i.e., only one contract, the contract ARS terminated.  The prayer does not also seek damages in connection with Consumers' decision not to award the *new* contract to ARS, nor for any actions or statements that may have led Consumers not to award the new contract to ARS.  Thus, Beard's post-termination comment about a re-bid labor rate (like any other post-termination conduct) is not itself actionable under the amended complaint as it is written.

The court thus disregards ARS's theory that post-termination conduct by Beard, Allen, and

-89-

## Tortious Interference with Contract

### (Count 3 - Against Beard and Boatright Only)

ARS alleges that Beard, Boatright, and Boatright Enterprises tortiously interfered with the ARS-

Consumers contract.  Under Michigan law,

> one who alleges tortious interference with a contractual or business relationship must allege the intentional doing of a *per se* wrongful act or the doing of a lawful act with malice and unjustified in law for the purposes of invading the contract rights or business relationship of another.

*CMI Int'l, Inc. v. Intermet Int'l Corp.*, 649 N.W.2d 808, 812 (Mich. App. 2002) (quoting *Feldman v.*

*Green*, 360 N.W.2d 881, 886 (Mich. App. 1984) and citing *Prysak v. R.L. Polk Co.*, 483 N.W.2d 629

(Mich. App. 1992) and *Stanton v. Dachille*, 463 N.W.2d 479 (Mich. App. 1990)).[40]

For this purpose, a wrongful act is one that is inherently wrongful or that can never be justified any

---

Boatright shows they conspired to ensure that Boatright would win the re-bid.  *See, e.g.,* ARS Opp'n:

> The Boatright Enterprises bid itself is powerful evidence that Mr. Beard (or Mr. Allen) assisted Boatright in obtaining the contract.  At the time that ARS was persuaded to terminate, its labor rate was $33.10 per hour.  That rate was set to increase, as of January 1, 2006, to $34.09 per hour.  For the time period beginning May 20, 2005 through May 9, 2006, Boatright Enterprises bid $34.10 per hour.  In other words, for the first seven months, Boatright Enterprises would charge $1 more than ARS had charged under its original contract, but for the first five months of 2006, Boatright Enterprises's rate would be just *one penny* more than ARS would have charged beginning in January.

> A jury will be asked to infer the obvious: that this is not a coincidence.  More likely, Mr. Beard, who was in constant communication with Boatright Enterprises prior to bid submission, divulged ARS's prior labor rate, or, at the very least, suggested the rate that Boatright Enterprises should bid.

*Id.* at 23-24.

[40]

*See also Mahrle v. Danke*, 549 N.W.2d 56, 60 (Mich. App. 1996) (citing *Jim-Bob, Inc. v. Mehling*, 443 N.W.2d 451, 462 (Mich. App. 1989)).

circumstances. *Shields v. Blessing*, 2005 WL 2090778, *2 (Aug. 30, 2005) (citing *Prysak*, 483 N.W.2d at

635 (citing *Formall, Inc. v. Cmty. Nat'l Bank of Pontiac*, 421 N.W.2d 289 (Mich. App. 1988))).  If the

defendant's conduct was not wrongful per se, the plaintiff must demonstrate "specific, affirmative acts that

corroborate the unlawful purpose of the interference."  *Pedell*, 2007 WL 840876 at *9 (citing *Badiee v.*

*Brighton Area Schs.*, 695 N.W.2d 521, 539 (Mich. App. 2005)).  "The weight of Michigan authority holds

that when the defendant's actions are motivated by legitimate business reasons, its actions do not constitute

improper motive or interference."  *Urban Assocs. v. Standex Electronics*, 216 F. App'x 495, 514 (6th Cir.

2007) (Griffin, J.) (collecting cases, including *Mino v. Clio Sch. Dist.*, 661 N.W.2d 586, 597-98 (Mich.

App. 2003)).

The plaintiff must also show that there was a breach of the contract, and that the defendant was a

third party to the contract.  *Dzierwa v. Michigan Oil Co.*, 393 N.W.2d 610, 613 (Mich. App. 1986);

*Plastech Engineered Prods. v. Grand Haven Plastics, Inc.*, 2005 WL 736519, *11 (Mich. App. Mar. 31,

2005) (citing *Reed v. Metro. Michigan Girl Scout Council*, 506 N.W.2d 231, 233 (Mich. App. 1993) (P.J.

Cavanagh, Richard Allen Griffin, Jansen)).

Having determined that Consumers did not breach its contract with ARS, the latter's claim that

Beard and Boatright tortiously interfered with that contract necessarily also fails.  "Unjustified interference

with a contractual relationship without a resulting breach of that contract does not constitute tortious

interference with contract."  *Global Tech., Inc. v. Moto Diesel Mexicana*, 2007 WL 1500178, *12 (E.D.

Mich. May 22, 2007) (citing *Health Call*, 706 N.W.2d at 858).  *See, e.g., Edwards v. Concord Dev. Corp.,*

*Inc.*, 1996 WL 33358104, *3 n.3 (Mich. App. Sept. 17, 1996) ("[T]he court properly held that plaintiffs

did not breach their contract with Concord, [and] therefore, the second element required for tortious

interference with a contract has not been met.").[41]

---

[41]

See    also    Saurman    v.    Bossardet, 2007    WL    1934793,    *6    (Mich.    App.    July    3,

For this reason, the court will grant summary judgment to Beard and Boatright on count 3.

## VICARIOUS LIABILITY
### (Count 7 - Against Consumers Energy only)

Under Michigan common law, an employer may be vicariously liable for the acts[42] of an employee who is acting in the course of his employment and within the scope of his authority. *Daniels v. New St. Paul Tabernacle Church of God in Christ*, 2003 WL 1984453, *2 (Mich. App. Apr. 29, 2003) (citing *Helsel v. Morcom*, 555 N.W.2d 852, 855 (Mich. App. 1996)). Thus, Consumers Energy cannot be held vicariously liable for another defendant's conduct unless that defendant was its employee or agent at the

---

2007)("[P]laintiffs alleged that defendants . . . tortiously interfered with plaintiff's contractual and business relations . . . . Because we conclude that there was no genuine issue of material fact as to whether Bossardet breached the assignment agreement, we also conclude that dismissal of these claims was proper."); *R.A. Vandevelde & Assocs. v. S/G Indus.*, 1996 WL 33357579, *4 (Mich. App. Oct. 8, 1996) ("S/G's securing of independent representation for its non-rubber parts and termination of the representative agreement did not constitute breaches of contract. Therefore, RAVA has not demonstrated a breach of contract as necessary for tortious interference with contractual relations.").

[42]

When all substantive claims against a defendant fail, a plaintiff's derivative claim of vicarious liability necessarily fails as well. *See Mills v. Combs*, 2005 WL 2045970, *2 (Mich. App. Aug. 25, 2005) ("[T]he jury returned a verdict of no cause of action in favor of defendants. . . , finding that no assault and battery ever occurred, which necessarily vitiated any vicarious liability.");

*Artley v. City of Detroit*, 1998 WL 1990893, *5 (Mich. App. July 17, 1998) ("[P]laintiff argues that the lower court should not have granted the city summary disposition because the city is vicariously liable for the gross negligence of . . . the officer . . . who detained plaintiff. However, by failing to show that her detention was unreasonably long, plaintiff necessarily fails to establish any wrongful conduct for which the city would be vicariously liable.")*;*

*Peters v. Golds*, 366 F. Supp. 150, 151 (E.D. Mich. 1973) ("Defendants contend the dismissal of Dr. Golds, the alleged primary wrongdoer, will necessarily require the dismissal of the corporation, which is vicariously liable. The validity of this general rule of liability is supported by *Dyke v. Richard*, . . . 198 N.W.2d 797 ([Mich. App.] 1972) and *Kambas v. St. Joseph Hospital*, . . . 205 N.W.2d 431 ([Mich.] 1973.").

*Cf. Moore v. Detroit Newspaper Agency*, 2001 WL 1612085, *1 (Mich. App. 2001) ("The release of an agent from liability necessarily discharges the principal from vicarious liability.") (citing *Felsner v. McDonald Rent-a-Car, Inc.*, 484 N.W.2d 408, 410 (Mich. App. 1992)).

time of the alleged wrong and was acting within the scope of his authority as employee or agent when he committed the tort.

Of the defendants, only Allen was employed by Consumers prior to ARS's termination of the contract.  In order to hold Consumers vicariously liable for *Allen's* conduct, ARS must show that Allen committed a tort and was acting in the course and scope his employment when he did so.  In order to hold Consumers vicariously liable for *Boatright's* conduct, ARS would have to show that Boatright was an agent at the time of his alleged tort and was acting within the scope of his agency when he committed the tort.  Likewise, in order to hold Consumers vicariously liable for *Beard's* conduct, ARS would have to show that Boatright was an agent at the time of his alleged tort and was acting within the scope of his agency when he committed the tort.

This court has determined that there is a genuine issue as to whether Beard violated the MUTSA, breached his common-law duty of loyalty and fiduciary duty, breached his contractual duty of confidentiality (counts 1 and 4), and as to whether Beard participated in a civil conspiracy (count 8).  However, Beard was not a Consumers Energy employee prior to ARS's termination of the contract, and he was not an *agent* of Consumers; therefore, any tort committed by Beard cannot form the basis for vicarious liability against Consumers Energy.

This court has held that Boatright did not commit tortious interference with contract, but that there is a genuine issue as to whether he participated in a civil conspiracy.  Nonetheless, Boatright was not an agent of Consumers when he (arguably) participated in that conspiracy, so Consumers cannot be vicariously liable for Boatright's participation in the conspiracy.

Finally, this court determined that there is a genuine issue as to whether Allen participated in a civil conspiracy "to improperly obtain and/or use Appalachian Railcar's pricing and other proprietary information", Am. Comp. ¶ 63.  Allen was employed by Consumers during that alleged conspiracy, and

a reasonable factfinder could find that he was acting within the course and scope of his employment when he did so.[43]  *See Montgomery v. State Farm Mut. Auto. Ins. Co.*, No. 272862, 2007 WL 1490870, *1 (Mich. App. May 22, 2007) ("The phrase 'in the course of his employment or authority' . . . means while engaged in the service of his master, or while about his master's business.") (quoting *Nevins v. Roach*, 228 N.W. 709 (Mich. 1930) (quoting *Riley v. Roach*, 134 N.W. 14 (Mich. 1912))); *Bologna v. Pevarnek*, No. 267244, 2007 4207801, *12 (Mich. App. Nov. 29, 2007) ("Vicarious liability is based upon principal-agent and master-servant relationships and involves the imputation of [fault] of the agent or servant to the principal or master *without regard to the fault of the principal or master*.") (quoting *McClaine v. Alger*, 388 N.W.2d 349, 354 (Mich. App. 1986)) (emphasis added, other citation omitted).  Accordingly, ARS has a potentially viable claim to hold Consumers vicariously liable for Allen's alleged participation in said conspiracy.

## CIVIL CONSPIRACY

### (Count 8 - Against all five defendants)

Finally, ARS alleged that all five defendants had engaged in a conspiracy, namely that they

> all worked in concert (1) to improperly obtain and/or use Appalachian Railcar's pricing and other proprietary information, (2) to induce Appalachian Railcar to terminate and rebid the contract by, among other things, conveying false information to Appalachian Railcar, and (3) to use Appalachian Railcar's pricing and other proprietary information to affect Boatright's bid price on the labor rate, in essence, stealing the Consumers contract from Appalachian Railcar.

Am. Comp. ¶ 63.  *See generally Antos v. Diocese of Lansing*, 2005 WL 3050473, *6 (Mich. App. Nov. 15, 2005) (dissenting o.g.) (A civil conspiracy is "'a combination of two or more persons, by some concerted action, to accomplish a criminal or unlawful purpose, or to accomplish a lawful purpose by

---

[43]

The parties' summary-judgment briefs do not specifically address why they believe Allen was, or was not, acting within the course and scope of his employment for Consumers when he (arguably) participated in the civil conspiracy.  Accordingly, this court will not entertain a motion for reconsideration which seeks to raise arguments or cite authority on this issue, as the parties could and should have included such material in their briefs.

criminal or unlawful means.'") (quoting *Mable Cleary Trust v. Edward-Marlah Muzyl Trust*, 686 N.W.2d 770, 786 (Mich. App. 2004)).  The court addresses the three parts of ARS's conspiracy claim *seriatim*.

First, as determined above, ARS has shown a genuine issue as to whether Beard breached MUTSA and/or his common-law duties of loyalty and fiduciary duty and/or his contractual duty of confidentiality (counts 1 and 4) by, *inter alia*, communicating ARS's bid/pricing information to Boatright.  Therefore, ARS can proceed on the portion of its conspiracy claim which alleges that all defendants "worked in concert(1) to improperly obtain and/or use Appalachian Railcar's pricing and other proprietary information", Am. Comp. ¶ 63.  *Cf. Mable Clery Trust*, 686 N.W.2d at 786 (stating, without further analysis, "Because there is no basis for the underlying tort with regard to Paxton, the trial court did not err in granting summary disposition to that party.  With regard to Developers, plaintiff has stated a viable [tort] claim. [Therefore], we find that plaintiff's civil conspiracy claim also survives summary disposition as relating to Developers only.") (citation omitted).

Second, as determined above, ARS's substantive claims for intentional misrepresentation/fraud by Beard and Allen (count 2) and tortious interference by Boatright, Boatright Enterprises, and Beard (count 3) fail.  Therefore, ARS cannot proceed on the portion of its conspiracy claim which contends that all five defendants "worked in concert . . . (2) to induce Appalachian Railcar to terminate and rebid the contract by, among other things, conveying false information to Appalachian Railcar . . . ."  *See Boykin v. Van Buren Twp.*, 2006 WL 305751, *16 (E.D. Mich. Feb. 9, 2006) ("Under Michigan law, a plaintiff cannot sustain a claim of either concert of action or conspiracy without establishing an underlying tortious act.") (citing, *inter alia*, *Early Detection Ctr., P.C. v. N.Y. Life Ins. Co.*, 403 N.W.2d 830, 836 (Mich. App. 1986) ("[A] claim for civil conspiracy may not exist in the air; rather, it is necessary to prove a separate, actionable tort.")), *aff'd in pt & rev'd in pt o.g.*, 479 F.3d 444 (6th Cir. 2007).  *See also People v. Hermiz*, 611 N.W.2d 783, 788 (Mich. 2000) ("Although conspiracy is a distinct offense, it is necessarily linked to

a substantive offense.").

Third, as determined above, according to the amended complaint's prayer for relief (as corroborated by the testimony of ARS's CEO), ARS does not seek damages related to its failure to win the re-bid contract. Therefore, ARS cannot proceed on the portion of its conspiracy claim which alleges that all five defendants "worked in concert . . . (3) to use Appalachian Railcar's pricing and other proprietary information to affect Boatright's bid price on the labor rate, in essence, stealing the Consumers contract from Appalachian Railcar", Am. Comp. ¶ 63.

## Order

For the reasons stated in the accompanying opinion, the motion for summary judgment filed by all five defendants [document #84] is **GRANTED in part** and **DENIED in part.**

**On Counts 1 and 4, summary judgment is granted to defendant Beard on the claim that** he breached his common-law duty of confidentiality;

**On Counts 1 and 4, summary judgment is denied as to** those portions which are deemed to state a claim under the Michigan Uniform Trade Secrets Act (MUTSA), the claim for breach of common-law duty of loyalty and fiduciary duty, and the claim for breach of contractual duty of confidentiality.

**On Count 2, intentional misrepresentation, summary judgment is GRANTED** to Beard & Allen.

**On Count 3, tortious interference with contract, summary judgment is GRANTED** to Beard, Boatright, and Boatright Enterprises.

**On Count 5, spoliation, summary judgment is GRANTED** to defendant Beard.

**On Count 6, breach of contract, summary judgment is GRANTED** to defendant Consumers.

**On Count 7, vicarious liability, summary judgment is GRANTED** to defendant Consumers **as to any misconduct by** defendants Boatright, Boatright Enterprises, or Beard, **but denied as to** any misconduct by defendant Allen.

**On Count 8**, civil conspiracy:

**Summary judgment is DENIED as to the claim that** all the defendants worked in concert "to improperly obtain and/or use Appalachian Railcar's pricing and other proprietary information";

**Summary judgment is GRANTED to all defendants as to the claim that** they worked in concert "to induce Appalachian Railcar to terminate and rebid the contract by, among other things, conveying false information to Appalachian Railcar";

**Summary judgment is GRANTED to all defendants as to the claim that** they worked in concert "to use Appalachian Railcar's pricing and other proprietary information to affect Boatright's bid price on the labor rate, in essence, stealing the Consumers contract from Appalachian Railcar."

This is not a final order, because it does not dispose of all claims as to all parties.

Accordingly, this order is not immediately appealable.

**IT IS SO ORDERED this 25th day of March 2008.**[44]

/s/ Paul L. Maloney
Honorable Paul L. Maloney
United States District Judge

---

[44]

Pursuant to the orders of January 24, 2007 and March 6, 2008, the following proceedings are scheduled: a settlement conference on April 17, 2008 before Magistrate Judge Carmody. Absent settlement, this judge will hold a final pretrial conference on May 6, 2008, and jury trial will commence on May 27, 2008.